GAIDRY, J.
l-jThe corporate president of a construction contractor appeals a judgment rendered in favor of his company’s customer and against him personally based upon his alleged fraud in delaying payment to subcontractors after receiving progress payments from the customer. For the following reasons, we reverse the judgment against the appellant.
FACTUAL BACKGROUND AND PROCEDURAL HISTORY
These consolidated actions arise from a contract of January 18, 2007, between the appellee, CEC Enterprises, L.L.C. (CEC), and Terri Matthews, Inc. (TMI), a construction contractor, for the construction of a restaurant building for CEC in Hou-ma, Louisiana. The appellant, Terri Matthews, is the president and a substantial shareholder of TMI, an Oklahoma-based corporation licensed to do business in Louisiana. At the time of the execution of the contract, Mr. Matthews owned 35.1% of the TMI’s corporate stock; his wife, Carolyn Matthews, owned 34.9%; Ron Mittel-stedt, TMI’s vice-president of operations, *506 owned 20%; and Jason Elkins, its senior project manager, owned 10%.[1]
TMI was the lower of two bidders for the construction contract. Its original bid was for the fixed amount of $901,471.00. The contract was a standard AIA (American Institute of Architects) form agreement between an owner and a contractor. It provided that for the stated amount, TMI would substantially complete the work no later than 115 days from the date of commencement established in a “notice to proceed.” During the course of the project, regular periodic progress payments would be made to TMI after application to the supervising architect, Carl P. Blum, and certification of |4payment by him. The project manual, forming part of the contract documents, required TMI to “promptly pay each [subcontractor, upon receipt of payment by the [o]wner,” an appropriate amount from the progress payments, based upon each subcontractor’s portion of the work done up to that time.
The contract further provided that TMI and its surety would be liable for liquidated damages of $500.00 per day for each day of delay in substantial completion and that TMI would receive bonus payments of $500.00 per day for each day for which substantial completion was completed in advance of the scheduled date. Clint Col-gin, CEC’s owner, was designated as the project owner’s representative and executed the contract on CEC’s behalf. Carl Blum was listed in the contract as the supervising architect for CEC. Ron Mit-telstedt was designated as the contractor’s representative in the contract, and Jason Elkins executed the contract on behalf of TMI.
The supervising architect sent TMI the “notice to proceed” on February 5, 2007, with an effective date of February 7, 2007. The corresponding completion date was June 2, 2007. TMI contracted with various subcontractors and material suppliers for the project. Mr. Matthews, as TMI’s president, initially was not actively involved in the daily operations of the project and did not sign any of the subcontracts, either in a representative or personal capacity.
Because TMI’s low bid was higher than CEC’s construction budget, the parties negotiated a change order reducing the amount of the contract by $123,601.00 to $777,870.00. TMI was represented by Mr. Mittelstedt in those negotiations. The change order was effective on February 8, 2007, the date it was signed by Mr. Elkins on behalf of TMI. Work commenced, and |fiCEC made an initial progress payment to TMI in the net amount of $92,673.00 on March 15, 2007. On April 25, 2007, a second progress payment in the net amount of $209,989.80 was made.
In March 2007, Mr. Mittelstedt left TMI’s employment to start his own competitive business, having recruited 50-70% of TMI’s employees and acquiring 60-70% of TMI’s customer base. That circumstance and the status of other projects undertaken by TMI disrupted TMI’s financial situation and liquidity and forced Mr. Matthews to assume a more active role in corporate management and operations.
In late April 2007, CEC began to receive complaints of nonpayment from various subcontractors and material suppliers. Upon learning of TMI’s failure to pay subcontractors and suppliers following the progress payments, Mr. Blum, the supervising architect, contacted representatives *507 of TMI to discuss the situation. The parties mutually agreed that in order to facilitate the completion of the stalled project, CEC would pay various subcontractors and suppliers directly in lieu of making further progress payments to TMI. The project was eventually completed some 240 days after its original scheduled date of substantial completion.
Terrebonne Concrete, L.L.C., a supplier of ready-mix concrete for the project, filed suit against CEC on April 25, 2008, for an open account and recognition of its materi-alman’s privilege on the property. Six other civil actions were instituted against CEC and TMI by various subcontractors and suppliers involved in the project, resulting in liens being recorded against the property. CEC also eventually filed suit against TMI and Mr. Matthews for damages based upon breach of contract, including liquidated damages, and based upon their alleged fraud. All of the actions were consolidated for trial.
|fiThe trial of the consolidated actions was conducted on January 26, 27, and 28, 2010. At the conclusion of the trial, the trial court issued its ruling and oral reasons for judgment. In addition to rendering judgment in favor of the various subcontractors and material suppliers, the trial court rendered a separate judgment in the action filed by CEC against TMI and Mr. Matthews, finding both defendants liable to CEC. The trial court’s judgment in that regard was signed on March 1, 2010, holding TMI liable to CEC for (1) $120,000.00 in liquidated damages for construction delay, per the terms of the contract; (2) $50,000.00 in statutory civil penalties for failure to apply progress payments to settle the claims of material suppliers and laborers, baséd upon the provisions of La. R.S. 9:4814; (3) $60.00 for the cost of recordation of the certificate of substantial completion; (4) $25,000.00 for attorney fees; (5) $24,000.00 for the cost of settlement with one subcontractor, who assigned its rights against TMI to CEC; (6) judgment for indemnity for all of the cross-claims and third-party demands asserted by CEC in the other consolidated actions; and (7) all costs and legal interest. The court also rendered judgment in favor of CEC and against Mr. Matthews for the sum of $100,000.00, based upon “a finding of fraud on the part of Terri Matthews as shareholder of Terri Matthews, Inc.”
Mr. Matthews appeals the judgment award rendered against him personally.[2]
ASSIGNMENTS OF ERROR
Mr. Matthews assigns the following error by the trial court:
Because the evidence does not demonstrate that Terri Matthews misrepresented the corporation’s financial condition to CEC, the trial court erred in finding that Matthews committed fraud.
Additionally, because CEC failed to demonstrate that Matthews commingled his personal funds with that of TMI, the trial court erred in piercing the corporate veil.
DISCUSSION
A corporation, as a juridical person, is separate and distinct from its members or shareholders. See La. C.C. art. 24 and Riggins v. Dixie Shoring Co., Inc., 590 So.2d 1164, 1167 (La.1991). A shareholder of a corporation generally cannot be held liable personally for any debt or liability of the corporation. See La. R.S. 12:93(B). Under our law, a single person may form a *508 Corporation. See La. R.S. 12:21. Accordingly, the fact that one person owns all or a majority of the stock of a corporation does not in itself make that person liable for corporate debts. Riggins, 590 So.2d at 1168. Generally, unless the directors or officers of a corporation purport to bind themselves individually, they do not incur personal liability for corporate debts. Id. at 1168-69.
There are limited exceptions to the rule of nonliability of shareholders for the debts of a corporation. Louisiana courts have allowed the piercing of the corporate veil under only two exceptional circumstances: (1) where the shareholders acting through the corporation practice fraud and deceit on a third party; and (2) the alter ego doctrine, where the shareholders have failed to conduct the business on a corporate footing, disregarding the corporate entity to such an extent that they and it become indistinguishable, thus in effect making the corporation simply their alter ego. McDonough Marine Serv. v. Doucet, 95-2087, pp. 5-6 (La.App. 1st Cir.6/28/96), 694 So.2d 305, 308-09.
In its petition, CEC alleged that Mr. Matthews was “the sole or main shareholder of TMI,” and that “TMI is the alter ego of Terri Matthews” (and vice versa). It alleged that TMI’s “performance under the contract, its | sunworkmanIike manner [sic], its failure to pay subcontractors,” and other actions constituted fraud on its part and that of Mr. Matthews. It further alleged that “Terri Matthews used the funds received from CEC per the progress payments for its [sic ] personal use and for other projects, and it [sic] failed to pay the subcontractors as per the terms of the contract.” According to the petition, such action “constitutes fraud and a comingling [sic] of funds, thereby allowing CEC to pierce the corporate veil of TMI and go after its shareholder, Terri Matthews.”
Despite the allegations of CEC’s petition, there was no testimony or other evidence at trial that Mr. Matthews diverted finances of the corporation for his personal use, commingled corporate assets or funds with his own, or misapplied or misdirected payments from CEC for his own benefit, or that he directed any other officer or employee of the corporation to do so. In its brief on appeal, CEC concedes that the judgment against Mr. Matthews is not predicated upon application of the alter ego doctrine for piercing the corporate veil, and that “it is perfectly clear that CEC was relying on fraud in order to hold [Mr.] Matthews personally liable” at trial. It is likewise clear from a reading of the trial court’s judgment and its oral reasons that there was no finding that Mr. Matthews individually, as opposed to TMI as contractor, violated the penalty provisions of La. R.S. 9:4814.[3] 1 flRather, the judgment *509 against him in his individual capacity was expressly predicated upon “a finding of fraud on [his] part ... as shareholder of [TMI],” presumably under the authority of La. R.S. 12:95.[4]
Fraud is defined in our civil code as “a misrepresentation or a suppression of the truth made with the intention either to obtain an unjust advantage for one party or to cause a loss or inconvenience to the other.” La. C.C. art. 1958. Fraud may also result from silence or inaction. Id. There are three basic elements to an action for fraud: (1) a misrepresentation, suppression, or omission of true information; (2) the intent to obtain an unjust advantage or to cause damage or inconvenience to the other party; and (3) the resulting error must relate to a circumstance substantially influencing the other party’s contractual consent. Shelton v. Standard/700 Associates, 01-0587, p. 5 (La.10/16/01), 798 So.2d 60, 64. See La. C.C. arts. 1958, 1955.
In order to find fraud from silence or suppression of the truth, there must exist a duty to speak or disclose information. Greene v. Gulf Coast Bank, 593 So.2d 630, 632 (La.1992); Boncosky Services, Inc. v. Lampo, 98-2239, p. - (La.App. 1st Cir.11/5/99), 751 So.2d 278, 287, writ denied, 00-0322 (La.3/24/00), 758 So.2d 798. And while fraud may indeed result from a party’s silence or inaction, mere silence or inaction without fraudulent intent does not constitute fraud. Fraudulent intent, or the intent to deceive, is a necessary and inherent element of fraud. See Whitehead v. Am. 10Coachworks, Inc., 02-0027, p. 6 (La.App. 1st Cir.12/20/02), 837 So.2d 678, 682. Fraud cannot be predicated upon mistake or negligence, no matter how gross. Id.
CEC claims that a “special relationship existed between CEC and TMI and Matthews” by virtue of TMI’s contractual and statutory obligation to pay its subcontractors and suppliers and that Mr. Matthews personally owed it a fiduciary duty to disclose TMI’s precarious cash-flow condition. Based upon the trial testimony of Mr. Colgin and Mr. Blum that prior knowledge of such a financial problem would have “affected” the decision to retain TMI as contractor, and upon Mr. Matthews’s position as president of TMI and purported status as its “ultimate decision maker,” CEC contends that Mr. Matthews is personally liable for fraud under La. R.S. 12:95.
Generally, the existence of a fiduciary duty and the extent of that duty depend upon the facts and circumstances of the case and the relationship of the parties. Basically, for a fiduciary duty to exist, there must be a fiduciary relationship between the parties. Scheffler v. Adams & Reese, LLP, 06-1774, p. 6 (La.2/22/07), 950 So.2d 641, 647. The defining characteristic of a fiduciary relationship is the special relationship of confidence or trust imposed by one in another who undertakes to act primarily for the benefit of the principal in a particular endeavor. Id., 06-1774 at p. 7, 950 So.2d at 648. See Black’s Law Dictionary 658 (8th *510 ed.2004). A fiduciary cannot further his own interests and enjoy the fruits of an advantage taken of such a relationship and must make a full disclosure of all material facts surrounding the transaction that might affect the decision of his principal. See Plaquemines Parish Comm’n Council v. Delta Dev. Co., Inc., 502 So.2d 1034, 1040 (La.1987).
_]jjWhether a legal duty is owed is a question of law. Smith v. Roussel, 00-1028, p. 6 (La.App. 1st Cir.6/22/01), 809 So.2d 159, 165. Corporate officers and directors owe a fiduciary duty to their corporation and its shareholders. La. R.S. 12:91(A) and 12:226(A). They do not, however, owe such a duty to persons or entities that contract with the corporation. McDonough Marine Serv., 95-2087 at pp. 11-12, 694 So.2d at 312; Dutton & Vaughan, Inc. v. Spurney, 600 So.2d 693, 697 (La.App. 4th Cir.), writ denied, 601 So.2d 663 (La.1992). Mr. Matthews, therefore, as president and shareholder of TMI, owed no fiduciary duty to CEC by reason of the construction contract and its obligations. See Dutton & Vaughan, supra. All contracts must be performed in good faith, and the conduct of both parties to a contract is governed by the standard of good faith. La. C.C. arts. 1759, 1983. This principle alone, however, does not serve to elevate a contractual relationship to a fiduciary relationship between the parties.
The existence of fraud is a question of fact. Whitehead, 02-0027 at p. 6, 837 So.2d at 682. Any circumstances constituting fraud must be alleged “with particularity.” La. C.C.P. art. 856. With regard to the standard of proof of fraud, La. C.C. art. 1957 provides that fraud need only be proven by a preponderance of the evidence, and that such proof also “may be established by circumstantial evidence.” Circumstantial evidence, including highly suspicious facts and circumstances surrounding a transaction, may be considered in determining whether a fraud has been committed. Williamson v. Haynes Best Western of Alexandria, 95-1725, p. 85 (La.App. 4th Cir.1/29/97), 688 So.2d 1201, 1239, writ denied, 97-1145 (La.6/20/97), 695 So.2d 1355.
Mr. Colgin, CEC’s owner, testified at trial that no representative of TMI ever advised him that TMI was experiencing a “cash flow problem,” 112and if he had been aware of such a problem, it would have “affected [his] decision to enter into a construction contract with [TMI].” Under cross-examination, however, Mr. Colgin confirmed that over the course of their discussions to resolve the construction delays and nonpayment of subcontractors, Mr. Matthews expressed his intention that TMI would finish the project it had undertaken and that in fact TMI did complete the construction of the restaurant. CEC introduced at trial extensive e-mail correspondence between the parties and numerous internal e-mails of TMI relating to the problems with the project, documenting TMI’s financial dilemma and difficulty meeting the construction schedule. However, CEC has not identified any “smoking gun” or convincing evidence of fraud on Mr. Matthews’s part, such as suspicious or unexplained corporate transactions bene-fitting him personally, intentional underca-pitalization on his part, or other hallmarks of fraud.
Mr. Matthews testified that TMI had been in existence since at least 1990 and was still in business as of the time of trial. Upon learning of the financial crisis facing the corporation, Mr. Matthews and his wife, as majority shareholders, undertook to recapitalize the corporation from their personal resources by selling property and mortgaging their home, eventually investing more than $300,000.00 in TMI. He *? attributed the delay in completing construction and in paying the subcontractors and suppliers to the project being underbid by approximately $200,000.00 by Mr. Mittelstedt, TMI’s former vice-president; the change order reducing the contract price; and other administrative and financial difficulties unrelated to the project at issue. On cross-examination, Mr. Matthews explained that TMI did not segregate the progress payments received from CEC in its operating checking account and conceded that meeting TMI’s payroll obligations to its 11semployees was initially given preference over timely payment of the subcontractors and material suppliers on the project at issue. At the conclusion of the project, TMI had paid the net sum of $105,961.80 in excess of the payments made by CEC.
The trial court explained its finding of fraud on the part of Mr. Matthews as follows:
[The] [c]ourt finds that based on the testimony ... with respect to ... those claims that were filed with those four or five lawsuits, it is apparent that as a result [sic ] of what happened, there was inadequate supervision....
Mr. Matthews is a primary shareholder in this corporation, and he is basically the person in charge.... Basically he was in charge, and what is very clear, and it’s not disputed, that there were two progress payments that were made, and that those moneys were not immediately paid to the [subcontractors....
[The] [c]ourt is of the opinion that there is some fraud because — and some personal liability because I don’t believe Mr. Matthews can sit here by silence or inaction and say — and with respect to his corporation say, well, somebody else was handling it, I don’t know what’s going on. That’s all his responsibility. And once he became aware of the problem, ...; Mr. Matthews came down to Houma, Louisiana.
(Emphasis added.)
After reciting those reasons for finding Mr. Matthews personally liable, the trial court remarked: “And I think it says a lot in this case that he’s tried to hold this together, that he tried to finish the project....” Thus, in its oral reasons, the trial court commended Mr. Matthews for his efforts toward ultimately fulfilling his company’s obligations under the contract while at the same time finding that he personally committed fraud. By way of contrast, the trial court in McDonough Marine Service found no fraudulent intent where “the evidence established that the shareholders were concerned about the mounting debts, but were determined to work harder to meet their | ufinancial obligations.” McDonough Marine Serv., 95-2087 at p. 11, 694 So.2d at 311.
In its reasons, the trial court described the judgment against Mr. Matthews as a “limited amount” of “some personal liability,” based upon “some fraud” involving the “silence and inaction” of Mr. Matthews and the delay in payment to subcontractors. The trial court’s reasons do not specify the time and factual context of Mr. Matthews’s “silence and inaction” or how those factors amounted to “a misrepresentation or suppression of the truth.” In its appellate brief, CEC emphasizes that Mr. Matthews did not affirmatively inform CEC of TMI’s “cash-flow problem” prior to or at the time that the parties entered into the contract. In doing so, however, CEC fails to identify the basis for any legal duty on Mr. Matthews’s part to do so in the context of a typical, arm’s-length commercial construction contract. As previously noted, Mr. Matthews owed no fiduciary duty to CEC simply by virtue of his position as TMI’s president and status as one of its primary shareholders. While no TMI representa *512 tive volunteered its internal financial information to CEC, conversely there was no evidence that CEC requested or sought such information prior to its bid being accepted and the contract being signed. The self-serving testimony of Mr. Colgin and Mr. Blum regarding the supposed relevance of that information to CEC must necessarily be viewed in light of the latter circumstance.[5]
11BIt is well settled that fraud cannot be predicated on unfulfilled promises or statements as to future events, and statements promissory in their nature and relating to future actions do not constitute actionable fraud. Bass v. Coupel, 93-1270, pp. 11-12 (La.App. 1st Cir.6/23/95), 671 So.2d 344, 351, writ denied, 95-3094 (La.3/15/96), 669 So.2d 426. Thus, TMI’s later breach of its contractual obligation to timely pay its subcontractors and material suppliers from the progress payments made by CEC cannot serve to make the contract negotiations and TMI’s execution and performance of the contract fraudulent in nature.
The trial court’s finding of liability on the part of Mr. Matthews was obviously based primarily, if not exclusively, upon his status as TMI’s president, “the person in charge” of “his” corporation, rather than upon any legal duty owed by him personally to CEC or upon any actual evidence of fraudulent intent on his part. Corporate officers and directors cannot be held personally liable to third persons for negligence, maladministration of corporate affairs, or omission of duty for acts done on behalf of the corporation, especially in a commercial context, such as that of this case. See Korson v. Independence Mall I, Ltd., 595 So.2d 1174, 1178-79 (La.App. 5th Cir.1992). Unless a corporate officer, director, or agent owes a personal duty toward a third person, greater than a general administrative responsibility, he cannot be held personally liable to that person for actions taken on behalf of the corporation. See Manning v. United Med. Corp. of New Orleans, 04-0035, pp. 6-7 (La.App. 4th Cir.4/20/05), 902 So.2d 406, 411, writ denied, 05-1313 (La.12/9/05), 916 So.2d 1063. And if the corporate officer, director, or agent delegated his general responsibility with due care to some subordinate or subordinates, he is not personally liable for the negligent performance of that responsibility. Id.
hfiCEC also emphasizes the testimony of the architect, Mr. Blum, to the effect that when he met with Mr. Matthews to discuss TMI’s failure to pay its subcontractors, Mr. Matthews “[held] himself out as a person who [was] ultimately responsible.” That testimony, standing alone and without further explanation, plainly falls short of proof of a personal guarantee or binding assumption of personal liability for TMI’s corporate obligations. The mere fact that the chief executive officer of a corporation acknowledges general administrative responsibili *513 ty for the overall operation of the corporation, or personally stands behind its good name in an effort to see that its obligations are met, hardly constitutes a basis for disregarding the corporation’s status as a separate entity and imposing personal liability upon him. Such a result would effectively defeat the fundamental public policy behind legal recognition of corporate existence.
We further note that the amount of the award, $100,000.00, is unexplained by the trial court and bears no discernible relation to the amount of liquidated damages awarded CEC under the contract or to any of the other awards made in the judgment. Moreover, the judgment does not identify Mr. Matthews’s liability in that regard as either joint or solidary with that of TMI for any of the previously-stated awards. Rather, the judgment simply seems to award a separate, additional monetary amount against Mr. Matthews for “fraud.”
A reviewing court must do more than simply review the record for some evidence which supports or controverts the trial court’s finding. The reviewing court must review the record in its entirety to determine whether the trial court’s finding was clearly wrong or manifestly erroneous. Stobart v. State ex rel. Dep’t of Transp. & Dev., 617 So.2d 880, 882 (La.1993). A reviewing court cannot shirk its duty of appellate review of fact by simply 117deferring to a trial court’s factual determinations because its reasons for judgment are couched in terms of a credibility call. Rogers v. City of Baton Rouge, 04-1001, p. 9 (La.App. 1st Cir.6/29/05), 916 So.2d 1099, 1104, writ denied, 05-2022 (La.2/3/06), 922 So.2d 1187. At some point, even a bare transcript may be so deficient in terms of quality of evidence that the trial court’s error is manifest, even if some credibility determinations were necessarily made. Id. Such is the case here.
In summary, after a careful review of all of the evidence presented at trial, the conclusion is inescapable that even circumstantial evidence of any fraud on Mr. Matthews’s individual part is singularly lacking. There is no evidence of any breach of duty by affirmative misrepresentation or knowing concealment of information on the part of Mr. Matthews and no evidence of any intent on his part to secure personal benefit to the detriment of CEC. See, e.g., Carter v. State ex rel. Dep’t of Transp. & Dev., 45,506, pp. 8-9 (La.App. 2nd Cir.8/11/10), 46 So.3d 787, 792. In short, there is no competent evidentiary basis of fraud to support the judgment against Mr. Matthews individually. The trial court’s finding in that regard is manifestly erroneous. The judgment of the trial court is reversed in part insofar as it holds Mr. Matthews personally liable to the appellee, CEC Enterprises, L.L.C. All costs of this appeal are assessed to the appellee, CEC Enterprises, L.L.C.
REVERSED IN PART.

. At the time of trial, TMI had three shareholders: Terri Matthews, Carolyn Matthews, and Jason Elkins.

. TMI has not appealed the judgment against it in favor of CEC, nor any other judgment against it in any of the other consolidated actions.

. Louisiana Revised Statutes 9:4814(A) provides, in pertinent part, that "[n]o contractor ..., or agent of a contractor ..., who has received money on account of a contract for the construction, erection, or repair of a building, structure, or other improvement, ... shall knowingly fail to apply the money received as necessary to settle claims to sellers of movables or laborers due for the construction or under the contract.” The statute provides for civil penalties of $500.00 to $1,000.00 for each $1,000.00 in "misapplied funds,” where the amount misapplied exceeds $1,000.00. La. R.S. 9:4814(C). However, it is clear that the right to seek recovery of civil penalties, unpaid claims, and attorney fees under the statute is limited to "[a]ny seller of movables or laborer whose claims have not been settled,” and does not exist in favor of the owner of the building or property. See La. R.S. 9:4814(A). CEC did not even allege entitlement to civil penalties in its petition. Although the statute was briefly mentioned in its pretrial memorandum, CEC first claimed relief under La. 9:4814 in its closing argument at trial. Thus, the award in favor of CEC under the statute appears to have been in error. But as the validity of that award is *509 not challenged on appeal, we mention this point only insofar as it bears upon the nature of the award against Mr. Matthews personally-

. Louisiana Revised Statutes 12:95 provides:
Nothing in this Chapter shall be construed as in derogation of any rights which any person may by law have against a promoter, subscriber, shareholder, director or officer, or the corporation, because of any fraud practiced upon him by any of such persons or the corporation, or in derogation of any right which the corporation may have because of any fraud practiced upon it by any of these persons.

. In the "Instructions to Bidders” document forming part of the project manual, under the section entitled "BIDDERS [sz'c] QUALIFICATIONS,” it was specified only that all bidders must be licensed under Louisiana law and that "[a]ny [b]idder may be required to furnish satisfactory evidence to the Owner that he and his proposed subcontractors have sufficient means and experience in the type of work called for to assure completion of the Contract in a satisfactory manner." There was no requirement that each bidder provide detailed financial information as a condition of submitting a bid, nor any evidence that CEC requested that such information be furnished. The circumstances that the contract was secured by a competitive bid process and that TMI was required to provide a performance bond from a surety in favor of CEC also call into question CEC’s claimed detrimental reliance on TMI’s financial condition.