# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 16-523

JAMES SIMMONS

VERSUS

LUBA WORKERS' COMP., ET AL.

\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
OFFICE OF WORKERS' COMPENSATION - # 3
PARISH OF CALCASIEU, NO. 15-03114
SAM L. LOWERY, WORKERS' COMPENSATION JUDGE

\*\*\*\*\*\*\*\*\*\*

## ELIZABETH A. PICKETT
## JUDGE

\*\*\*\*\*\*\*\*\*\*

Court composed of Marc T. Amy, Elizabeth A. Pickett, and John E. Conery, Judges.

**AFFIRMED IN PART; REVERSED IN PART; RENDERED IN PART; AND REMANDED FOR CALCULATION OF ATTORNEY FEES AS SET FORTH HEREIN.**

Eric J. Waltner
Allen & Gooch
Post Office Box 81129
Lafayette, LA 70598-1129
(337) 291-1400
COUNSEL FOR DEFENDANT-APPELLANT:
    LUBA Workers' Compensation

**Jason R. Bell**
**Cox, Cox, Filo, Camel & Wilson**
**723 Broad Street**
**Lake Charles, LA 70601**
**(337) 436-6611**
**COUNSEL FOR PLAINTIFF-APPELLEE:**
    **James Simmons**

**PICKETT, Judge.**

Workers' compensation insurer appeals the denial of its claim that it is entitled to a credit against the workers' compensation benefits it owed to the claimant/owner for undistributed income of the claimant/owner's sub-Chapter S corporation and rent the corporation paid the claimant/owner. Insurer also appeals the award of attorney fees and penalties for its termination of supplemental earnings benefits. We affirm in part, reverse in part, render in part, and remand for further proceedings on one issue.

## FACTS

James Simmons and his wife, Debbie, are the owners and sole shareholders of Simmons Contracting, Inc. (SCI), a sub-Chapter S corporation engaged in residential construction. James and Debbie are both involved in the day-to-day operation of the business. James handles the construction aspect of the business, while Debbie administers the clerical and financial aspects of the business. In August 2012, James injured his ankle while working at a construction site. He was able to continue working until February 2014, when his treating physician performed surgery on his ankle and declared him to be unable to work.

SCI's workers' compensation insurer, LUBA Casualty Insurance Company, began paying James's medical expenses upon being notified of his injury and began paying him temporary total disability (TTD) benefits after his surgery. LUBA paid James $500.02 per week in TTD benefits pursuant to an agreement between his attorney, LUBA's attorney, and LUBA's adjustor that his average weekly wage was $750. In early May 2014, James was released to light-duty work and returned to work. SCI paid James $200 per week in wages while he could perform only light-duty work. LUBA converted his TTD benefits to supplemental earnings benefits (SEBs) at that time and paid him SEBs at the rate of $1,500 per

month based on James's $200 per week salary. LUBA terminated James's SEBs on March 30, 2015, and he filed a 1008 Disputed Claim form, seeking reinstatement of his benefits, penalties, and attorney fees.

On October 22, 2015, the matter was tried before a Workers' Compensation Judge (WCJ). The parties stipulated that James's average weekly wage was $750. After the trial, the WCJ took the matter under advisement. On January 27, 2016, the WCJ issued oral Reasons for Ruling in which he concluded that no evidence in the record justified LUBA's termination of James's SEBs. The WCJ ordered LUBA to:

1. Reinstate James Simmons' [SEBs] based on the average weekly wage of $750 and the wages he is earning through [SCI] as reflected on the monthly report of earnings forms;

2. Pay James Simmons back-due [SEBs] from March 2015 through the date of judgment;

3. Pay a penalty of $8,000 for discontinuation of James Simmons' indemnity benefits;

4. Pay attorney fees in the amount of $8,550;

5. Pay $650.00 for the professional fees of Brent Cating.

The WCJ's reasons were reduced to a written judgment, and LUBA filed this appeal. James filed an answer to the appeal, seeking an award of attorney fees for work performed by his attorney on this appeal.

## ASSIGNMENTS OF ERROR

LUBA assigns the following errors with the WCJ's judgment:

I. The Court committed legal error in failing to include for purposes of SEB calculation the business income from claimant's business, [SCI].

II. The Court committed legal error in failing to recognize credits/offsets;

III. The Court committed legal error in paying a non-expert witness for his testimony; and

2

IV.    The Court committed legal error or alternatively manifest error in assessing penalties and attorney[] fees.

## STANDARD OF REVIEW

When reviewing a WCJ's findings of fact, appellate courts do not review the findings of fact to determine whether they are right or wrong but whether they are reasonable based on the record. *Dean v. Southmark Constr.*, 03-1051 (La. 7/6/04), 879 So.2d 112. Unless the WCJ's findings of fact are found to be manifestly erroneous or clearly wrong, those findings will not be set aside. *Id.* A factfinder's choice can virtually never be wrong if the evidence presents two reasonable views of the facts. *Rosell v. ESCO*, 549 So.2d 889 (La.1989).

When an error of law is alleged on appeal, the appellate court must determine whether the WCJ's ruling was legally correct. *Edwards v. Ford Motor Co.*, 06-101 (La.App. 3 Cir. 6/21/06), 934 So.2d 221, *writ denied*, 06-1847 (La. 10/27/06), 939 So.2d 1282. If the appellate court's review reveals a reversible error of law, it must conduct a de novo review of the record and render judgment on the merits if possible. *Bridges v. Nelson Indus. Steam Co.*, 15-1439 (La. 5/3/16), 190 So.3d 276. "A legal error occurs when a trial court applies incorrect principles of law and such errors are prejudicial." *Evans v. Lungrin*, 97-541, 97-577, p. 7 (La. 2/6/98), 708 So.2d 731, 735. Such "errors are prejudicial when they materially affect the outcome and deprive a party of substantial rights." *Id*.

## DISCUSSION

### *Did the WCJ Err by Not Including SCI's Income in James's SEB Calculation?*

The evidence established that SCI had $63,116 in taxable earnings and retained $75,950 cash in its bank account at year's end in 2014. LUBA argues the WCJ erred in not treating James as a sole proprietor and attributing SCI's earnings as income to him for calculating his SEBs. *See Caparotti v. Shreveport Pirates*

*Football Club*, 33,570 (La.App. 2 Cir. 8/23/00), 768 So.2d 186, *writ denied*, 00-2947 (La. 12/15/00), 77 So2d 1230; *Clark v. Bobby L. Clark Trucking*, 28,405 (La.App. 2 Cir. 6/26/96), 679 So.2d 157.  Thus, although SCI is a corporation, LUBA seeks to treat James and SCI as a sole proprietorship.

A corporation is a juridical person that is separate and distinct from its members or shareholders.  La. Civ.Code art. 24; *Riggins v. Dixie Shoring Co., Inc.*, 590 So.2d 1164 (La.1991).  As a general rule, this legal tenet applies regardless of the fact that one person owns all or a majority of the stock of a corporation, and a sole shareholder or majority shareholder is not liable for corporate debts, unless he binds himself individually for those debts.  La.R.S. 12:93(B);[1] *Riggins*, 590 So.2d 1164.  There are exceptions to this general rule; fraud or deception is one exception.  *Riggins*, 590 So.2d 1164.  Fraud must be pleaded with particularity.  La.Code Civ.P. art. 856.  Another exception arises when the shareholder fails to properly conduct the corporation's business as a separate entity, and the shareholder and the corporation become indistinguishable such that, in reality, the corporation is the alter ego of its shareholder.  *Terrebonne Concrete, LLC v. CEC Enters., LLC*, 11-72 (La.App. 1 Cir. 8/17/11), 76 So.3d 502, *writ denied*, 11-2021 (La. 11/18/11), 75 So.3d 464.

LUBA argues that because the Simmonses have sole control over SCI's finances, their failure to disburse any of SCI's 2014 earnings to themselves warrants crediting those earnings to James as income.  LUBA did not plead fraud.  Therefore, because SCI is a corporation and not a sole proprietorship, LUBA must establish that the Simmonses' management of SCI has created an exception to the general rule discussed above.

---

[1] Effective January 1, 2015, La.R.S. 12:93 was repealed and replaced by La.R.S. 12:1-622.  The content of each statute is the same.

4

The only evidence on this issue was presented by Brent Cating, a CPA who has been preparing SCI's and the Simmonses' tax documents and filings for twenty years. Mr. Cating testified that SCI is a sub-chapter S corporation and that pursuant to federal taxation laws, its income is passed through to the Simmonses for tax purposes. Therefore, the Simmonses, not SCI, pay the taxes on its corporate earnings.

Mr. Cating discussed SCI's finances at length. He explained that in 2014, the corporation had a gross profit of $168,215 and $63,116 in earnings, but the earnings were not distributed to the Simmons. He also explained that SCI repaid the Simmonses $76,000 on an $86,000 loan they had made to the corporation the previous year and also paid them $24,468 in rent for its use of a work shop and equipment, including a truck and trailer, they own.

Mr. Cating testified that he recommended the Simmonses leave SCI's 2014 earnings in the corporation because the funds would be needed to fund new construction projects in 2015. He explained that if the earnings were distributed to the Simmonses, more likely than not, they would have to extend another personal loan to SCI or procure a loan through third parties for new construction projects it contracted. Mr. Cating discussed in depth the financial volatility of SCI's business, the Simmonses' history of having to loan the corporation money to fund projects, and his continued recommendation that they leave funds in the corporation at the end of every year to prevent the need for them to personally loan the corporation money for new projects.

Mr. Cating's testimony, the itemized financial information, and the documentation of SCI's day-to-day business establish that the Simmonses do not treat SCI as their alter ego. Accordingly, the WCJ did not err in refusing to attribute SCI's earnings to James for the purpose of calculating James's SEBs.

LUBA also argues that because the corporation made more money in 2014 than in the preceding two or so years, James's draw of only $200 per week as a salary did not reflect the true extent of the work he performed for the corporation. James testified that for a number of years he had paid himself $1,000 per week and that before his surgery, he actively participated in every aspect of his business, including bull dozer land work and construction work. James explained that when he returned to work after surgery, he was limited to supervising jobs, bidding jobs, handling clients, dealing with subcontractors, obtaining permits, and participating in inspections performed by regulatory agencies and banks. He testified that he did not believe his work after the surgery warranted a $1,000 per week salary because he could not perform all the tasks he performed before surgery. Therefore, SCI to hire labor to perform the work he could not and he felt like he had to offset this additional expense to SCI by reducing his weekly salary.

The WCJ accepted James's testimony on this issue. We do not find the WCJ's conclusion unreasonable in light of the corporation's financial history and the fact that after James's surgery, the corporation hired additional labor to perform physical work that James normally performed.

### Did the WCJ Err in Not Including Rents in James's SEB calculation?

Mr. Cating testified that in 2014, SCI paid the Simmonses rent totaling $24,468, for its use of a work shop and equipment they owned. LUBA asserts that the rent should be considered as income to James for purposes of his SEBs calculation. It cites *Delahoussaye v. Live Oak Gardens, Ltd.*, 09-246 (La.App. 3 Cir. 10/7/09), 21 So.3d 1060, *writ denied*, 09-2772 (La. 2/26/10); 28 So.3d 278, in support of this argument. In *Delahoussaye*, the issue was whether the claimant's SEBs were subject to a credit for all income the claimant received as a result in his ownership interests in two local companies. The panel in *Delahoussaye* explained

6

that the Workers' Compensation Act requires claimants to report income on 1020 forms from "any other employment" before concluding that Mr. Delahoussaye's involvement in the operation of the companies "was minimal but clearly more than just an investment"; therefore, that income should have been reported on a 1020 form and offset against his SEBs as provided in La.R.S. 23:1221. *Id*. at 1063.

We find the reasoning of *France v. A&M Wood Co.*, 566 So.2d 106 (La.App. 2 Cir. 1990), applicable to the facts herein. In *France*, the court rejected a similar argument regarding a workers' compensation claimant who was paid rent for a truck that he owned and used when working on a logging crew. The claimant could not work due to his injury, but he was paid rent for the crew's use of his truck in his absence. The court determined that because the claimant was not operating the truck at that time, the rent was a return on capital, not earnings or wages. There is no evidence on this issue other than SCI's payment of rent for equipment. Accordingly, we find no error with the WCJ's refusal to include SCI's rental payments in James's SEBs calculation.

***Did the WCJ Err in Not Awarding LUBA a $1,000 Per Week Credit against James' SEBs?***

LUBA argues that it is entitled to a credit for SEBs it paid James after he was released to light-duty work because SCI paid him $1,000 per week in salary beginning the date of his surgery, February 11, 2014, until he was released to light duty on May 7, 2014. This argument is based on James's testimony that SCI continued paying him $1,000 per week after he had surgery. The argument does not take into account that James also testified he was not certain that his testimony was accurate and that checks written by SCI to him would show what SCI actually paid him.

James reported being paid a salary of $200 per week on his 1020 forms beginning April 30, 2014. He points to the quarterly tax forms SCI filed that show SCI paid him $200 per week for the time period in question, but there are no 1020 forms in evidence for any period from February 11 through May 7, 2014. The record does contain a check issued by SCI to James dated March 12, 2014, in the amount of $1,500. There is no notation on the check indicating the purpose of the payment; however, the check is included with documentation of payments SCI made to James for rent and loan repayment. Based on this evidence, we cannot say the WCJ erred in denying LUBA's request for a credit.

### *Did the WCJ Err in Awarding an Expert Witness Fee?*

In this assignment of error, LUBA argues the WCJ erred in awarding James an expert witness fee for Mr. Cating's testimony at trial because Mr. Cating was neither tendered by James nor qualified by the WCJ as an expert, and he testified only as to facts without expressing an expert opinion.

In *Hebert v. Diamond M. Company*, 385 So.2d 410 (La.App. 3 Cir.), *writs denied*, 390 So.2d 203 (La.1980), this court vacated an award of expert fees where not only were the witnesses not qualified as experts, they offered no expert testimony on any aspect of the case. Similarly, in *Bourgeois v. Heritage Manor of Houma*, 96-135 (La.App. 1 Cir. 2/14/97), 691 So.2d 703, a physical therapist who testified at trial regarding what transpired during therapy sessions but was not qualified as an expert was not entitled to an expert witness fee. *See also*, *Dorsett v. Johnson*, 34,500 (La.App. 2 Cir. 5/9/2001), 786 So.2d 897, *writ denied*, 01-1706 (La. 9/28/01), 798 So.2d 115, where the witness at issue was not qualified as an expert, and the court determined he was not entitled to an expert fee. For these reasons, the WCJ erred in awarding James a $650 expert witness fee for Mr. Cating's testimony.

### Did the WCJ Err in Awarding Penalties and Attorney Fees?

In its last assignment of error, LUBA asserts that the WCJ erred in awarding James penalties and attorney fees. Dana Munson, LUBA's adjuster, testified that she terminated James's SEBs because as the owner of SCI, he was required to submit information regarding the company's income upon request. She further testified that LUBA began requesting that information in September 2014 and that after requesting the information a number of times and not receiving a response from James, she terminated his SEBs. Ms. Munson acknowledged that James filed 1020 forms every month while he was receiving SEBs and that he reported being paid $200 per week by SCI on every 1020 form he filed. She also admitted that when she terminated his SEBs, she had no information that James received any income other than the income he reported on his 1020 forms. Ms. Munson also acknowledged that James continued filing 1020 forms after his SEBs were terminated.

Mr. Simmons testified that he did not provide the additional information Ms. Munson requested because it was personal information that he felt LUBA was not entitled to receive. In August 2015, Mr. Cating prepared correspondence and a chart detailing the information he testified to at trial. The chart included thirteen years of SCI's pertinent financial information. It corroborates Mr. Cating's testimony that the Simmonses' construction business is extremely volatile. The chart also reflects that in seven of the thirteen years included, SCI made distributions to the Simmonses. Two of the distributions were $20,433 in 2002 and $15,379 in 2004, but the remaining five distributions were less than $7,000. Cash was left in SCI's bank account every year, usually in relatively low amounts however.

The itemized information reflects that the Simmonses' decision not to take any distributions in 2014 was not unusual. In 2014, $75,950 cash was left in SCI's bank account. That was the largest cash balance left in SCI's account at year end; however, the next largest balance was $67,409 in 2006.

"Any . . . insurer who at any time discontinues payment of claims . . . when such discontinuance is found to be arbitrary, capricious, or without probable cause" subjects itself to the payment of a penalty and attorney fees. La.R.S. 23:1201(I). "Arbitrary and capricious behavior consists of willful and unreasoning action, without consideration and regard for facts and circumstances presented, or of seemingly unfounded motivation." *Brown v. Texas-LA Cartage, Inc.*, 98-1063, pp. 8-9 (La. 12/1/98), 721 So.2d 885, 890. The determination of whether an employer should be cast with penalties and attorney fees in a workers' compensation case is essentially a question of fact and subject to the manifest error/clearly wrong standard of review. *Reed v. Abshire*, 05-744 (La.App. 3 Cir. 2/1/06), 921 So.2d 1224.

Ms. Munson testified that she did not reinstate James's SEBs after receiving SCI's itemized financial information because she did not feel the 1020 forms he submitted were completely correct, asserting again that he was required to report SCI's earnings on the form. LUBA argues that Ms. Munson's termination was justified based on the holding in *Delahoussaye*, 21 So.3d 1060. Although we rejected LUBA's argument that SCI should be treated as a sole proprietorship, we cannot say Ms. Munson's skepticism regarding James's wages was unwarranted because SCI is a sub-Chapter S corporation and James and Debbie had SCI's income at their disposal. Therefore, the only means of verifying the correctness of information James reported on his 1020 forms was by obtaining SCI's financial information.

10

James did not deny that he never provided the requested information. He testified instead that he believed the information requested was personal information that he did not have to provide to LUBA. James did not provide the requested information until late August 2015. Under these facts, we find the WCJ erred in awarding penalties and attorney fees for LUBA's termination of James's SEBs.

On August 24, 2015, James's attorney forwarded SCI's financial information prepared by and testified to by Mr. Cating to LUBA. Accordingly, we find that LUBA's failure to reinstate James's SEBs within a reasonable time after receipt and review of that information was arbitrary and capricious. We further find that by September 1, 2015, LUBA had sufficient information and time within which to verify that the information by James reported on his 1020 forms was correct. For these reasons, we find that LUBA's refusal to reinstate James's SEBs on or before September 1, 2015, was arbitrary and capricious and that James is entitled to penalties and attorney fees.

Pursuant to La.R.S. 23:1021(I), James is entitled to an award of $8,000 in penalties for LUBA's failure to reinstate his SEBs. Therefore, the WCJ's award of $8,000 in penalties is affirmed. As discussed above, James is only entitled to attorney fees for the period from September 1, 2015, through the trial of this matter. We have reviewed James's attorney's statement regarding the work he performed representing James. The statement is not itemized by individual dates with the work performed and charges for work performed on each date. Therefore, this court cannot award attorney fees for work performed by James's attorney during that period of time. Accordingly, we remand this matter to the WCJ for receipt of evidence required for calculation of an award for attorney fees for the period September 1, 2015 through trial.

11

***James's Answer to Appeal***

In his answer, James seeks an award of additional attorney fees for work performed on appeal. We award James $1,500 for work performed on appeal.

## DISPOSITION

For the reasons discussed herein, the WCJ's judgment is affirmed in part and reversed in part, and the matter is remanded to the WCJ for calculation of attorney fees due James Simmons for the period September 1, 2015, through trial. James Simmons is awarded attorney fees in the amount of $1,500 for work performed by his attorney on appeal. All costs are assessed against LUBA.

**AFFIRMED IN PART; REVERSED IN PART; RENDERED IN PART; AND REMANDED FOR CALCULATION OF ATTORNEY FEES AS SET FORTH HEREIN.**