| | | |
|---|---|---|
| MATHES BRIERRE ARCHITECTS, A PROFESSIONAL CORPORATION | * | NO. 2019-CA-0357 |
| | * | COURT OF APPEAL |
| VERSUS | * | FOURTH CIRCUIT |
| | * | STATE OF LOUISIANA |
| KARLTON/ISG ENTERPRISES, LLC, INTERNATIONAL SALES GROUP, LLC, AND J.S. KARLTON COMPANY, INC. | * | |
| | * | |

\* \* \* \* \* \* \*

**LOBRANO, J., CONCURS IN PART, DISSENTS IN PART, AND ASSIGNS REASONS.**

JCL    I respectfully concur in part and dissent in part as set forth in the following opinion:

In this contract case, appellee, Mathes Brierre Architects, a Professional Corporation ("Mathes"), filed its petition in May 2015 and sought to recover sums due under an architectural contract executed in 2007 ("Agreement") between it and appellant, Karlton/ISG Enterprises, L.L.C., a Florida Limited Liability Company ("Karlton/ISG").  In addition to suing Karlton/ISG, Mathes also named as additional defendants the only two members of Karlton/ISG (sometimes collectively "Members"), which are as follows: (1) International Sales Group, L.L.C., a Florida Limited Liability Company ("ISG Co.") formed in 2002 as a real estate marketing business with its members being Craig Nicole, Inc. (owned by Craig Studnicky) and Monogram Marketing, Inc. (owned by Philip Spiegelman) and (2) J.S. Karlton Company, Inc., a Delaware Corporation, ("Karlton Corp."), owned by John Karlton.[1]  Michael Ambrosio was the president and a manager of

---

[1] This opinion refers to two types of limited liability entities.  The word "company" refers to limited liability companies and the word "corporation" refers to incorporated entities. Corporations have a long history in America, borrowed from our English roots and carried over from our colonial past to the days of our industrial revolution and the golden age of the corporation to the present state of corporations.  P. M. Vasudev, *Corporate Law and Its Efficiency: A Review of History*, 50 Am. J. Legal Hist. 237, 240 (2010).  Companies, however, are a newer creation.  In 1992, the Louisiana Legislature enacted Chapter 22, "Limited Liability Companies," comprised of R.S. 12:1301 through 1369, which, *inter alia*, authorized the

1

Karlton/ISG as well as the president of ISG Co. Steve Lipkins acted on behalf of Karlton Corp. Also in 2015, Ambrosia, Spiegelman, and Studnisky formed River Street Ventures, L.L.C. ("River Street").

After Hurricane Katrina, John Karlton, along with others, toured New Orleans, on both the east and west banks of the Mississippi River, to locate a potential project to assist New Orleans and its citizens. The planned development became known as the "Algiers Crossing Development," which was to be a commercial and residential development on the west bank of the Mississippi River directly across from the New Orleans Business District (the "Project").

John Karlton had a prior relationship with Ed Mathes and hired his architectural firm to design and perform other services associated with the Project. With the full knowledge of Ed Mathes, Karlton/ISG was formed on January 31, 2006 to carry out the Project to completion. Substantial capital contributions were initially made to Karlton/ISG as evidenced by the undisputed fact that Mathes was paid over a million dollars[2] for services rendered on the Project during the first three years of the joint business venture between Karlton Corp. and ISG Co.

The initial business transactions began in May 2006 and involved Karlton/ISG entering into an agreement with certain entities affiliated with various individuals, including Blaine and Barry Kern (collectively "Kern Entities") to obtain options to purchase four tracts of property in Algiers with the intent to

---

formation of limited liability companies. "LLCs filled an important void for small businesses left open by corporations and partnerships by providing the limited liability traditionally associated with corporations in addition to the tax advantages and flexible managerial provisions of partnerships. These three appealing advantages create an enticing business entity for businesses large and small and have led to the LLC quickly becoming a prominent business organization despite being a relatively new entity type." Thomas Bourgeois, *Mirror, Mirror: Amending Louisiana's LLC Statutes Related to Personal Liability of Members to Reflect Corporate Counterparts After* Ogea v. Merritt, 76 La. L. Rev. 1339, 1358 (2016).

[2] In the Appellant brief, the amount indicated was $1,162,976.51, and in the district court's Reasons for Judgment the amount was $1,163,232.00.

develop the Project in multiple phases ("Option Agreement"). Tract I was the site of Phase 1 of the Project.

Mathes began working on Phase 1 of the Project in February 2006. Initially, Mathes invoiced Karlton Corp. from March 7, 2006 through March 1, 2007 for services rendered. On February 26, 2007, Karlton/ISG and Mathes entered into the Agreement, a formal written agreement to provide architectural services for various phases of the Project. Thereafter, Mathes invoiced Karlton/ISG.

The Agreement was drafted by Mathes and provided that Karlton/ISG was to make payments to Mathes for work performed under "Basic Services" and "Additional Services."[3] The Agreement also provided that Mathes was to be compensated $2,000,000.00 for Basic Services and that the payment for "Master Planning Services" such as conceptual design, preliminary sketches and building designs shall be made upon the successful sale of the condominium units in Phases 1 and 2 of the extended project in proportion to the number of units included in Phases 1 and 2. Mathes agreed to provide "Basic Services", including "Schematic Design," "Design Development," "Construction Documents," "Negotiation or Bidding," and "Construction Administration." The Agreement for "Basic Services" was for a period of one year and if "Basic Services" were not completed within one year of the Agreement, through no fault of Mathes, Mathes was entitled to be compensated for its services beyond that time as "Additional Services."[4] Mathes further agreed to provide "Additional Services" on an as needed basis. Under the Agreement, Karlton/ISG was to make payments to Mathes for worked performed under "Basic Services" and "Additional Services." Payments for

---

[3] The parties agreed "Basic Services" would be computed on a percentage basis, as set forth in Agreement Article 11.2.1, and "Additional Services" would be computed on an hourly basis as set forth in Agreement Article 11.3.2.

[4] Agreement Article 11.5.1 provides for a year timeline for the Project, with the exception that if, through no fault of Mathes, the Project takes longer than a year, services beyond that time will be compensated as per Agreement Articles 10.3.3 and 11.3.2.

"Additional Services" were due monthly upon presentment of the architect's statement of services rendered or expenses incurred. The Agreement specifically acknowledged that Mathes had already performed Master Planning Services for the Project in the amount of $329,087.50 and further provided that the payment thereof was to be made upon the successful sale of the condominium units in Phases 1 and 2.

Karlton/ISG and the Kern entities subsequently executed four (4) amendments to the Option Agreement. On June 1, 2007, the "Fourth amendment" stated that Karlton/ISG has exercised its option to acquire Tract I, which was the site of Phase 1. A deposit in the amount of $600,000.00 was required and Spiegelman had requested security. John Karlton refused to assist in the deposit and Spiegelman arranged for an ISG affiliated company to pay the $600,000.00 deposit to Algiers Ventures, L.L.C. ("Algiers Ventures"), an entity associated with the Kerns. The deposit was evidenced by a promissory note dated June 1, 2007 granted by Algiers Ventures ("Note") to Karlton/ISG and secured by a Multiple Indebtedness Mortgage in the maximum sum of $1,000,000.00 encumbering Tract I ("Mortgage").[5]

John Karlton eventually ceased making additional capital contributions to Karlton/ISG, the Project stalled after 2008, and Mathes performed minimal work

---

[5] Mathes claims, and the district court found, that the principals of Karlton/ISG in August 2015 diverted the Note for the benefit of River Street when Ambrosio, on behalf of Karlton/ISG, executed and delivered to the Kern entities a "Release by Obligee of Record" of the Mortgage and the Note in satisfaction of River Street's obligation imposed under a purchase agreement entered on August 11, 2015 to purchase different property located on the Westbank owned by Barry Kern or entities he controlled. Mathes claims that River Street received credits to future dealings with Kern entities in exchange for the releases. Karlton/ISG and Members argue that no payments were ever made on the Note and that the Note therefore prescribed in June 2012 by operation of the 5-year prescriptive period set forth in La. R.S. 10:3-118(b), thereby extinguishing the Mortgage, and that Karlton/ISG had an affirmative duty to cancel the Mortgage. Mathes argues that the Note was not prescribed, pointing out Spiegelman and Ambrosio's testimony that they understood the Note to be valid at the time it was released to allow River Street to acquire the Tract 3 property and Ambrosio's testimony that the Kerns had acknowledged the Note on several occasions, thereby interrupting the running of prescription on the Note.

thereafter. The parties did not exercise any rights under the Note and Mortgage and the Note allegedly prescribed in June 2012. On August 11, 2015, Karlton/ISG executed a "Release by Obligee of Record" for the Mortgage.

There was an outstanding balance totaling $555,689.23 with respect to invoices forwarded to Karlton/ISG between March 7, 2006 and September 19, 2008 for services mostly rendered in 2007. The outstanding balance of $555,689.23 was for payment for services rendered as follows: (1) in 2006 and 2007, prior to the Agreement, the balance totaled $12,101.61; (2) in 2007, under the Agreement, the balance totaled $524,375.06; and (3) in 2008, under the Agreement, the balance totaled $19,212.56 ("Outstanding Balance").[6]

On December 26, 2012, Mathes demanded payment on the Outstanding Balance. On July 10, 2013, Mathes sent a new invoice to Karlton/ISG in the amount of $478,737.50 for services rendered under the Agreement as follows: invoices in 2008 totaled $412,660.00; invoices in 2009 totaled $10,232.50; invoices in 2010 totaled $830; invoices in 2011 totaled $10,715.00; and invoices in 2012 totaled $44,300.00 ("2013 Invoice").

Karlton/ISG eventually filed abandonment losses in 2006 and 2007 and did not carry out the Project to completion.[7] Ed Mathes claims that he was not made

---

[6] Karlton/ISG made its last payments on these invoices on January 18, 2008 in the amount of $73,162.65 and on February 22, 2008 in the amount of $100,000.00, at which time there was an outstanding balance of $45,587.35.

[7] Karlton/ISG claimed a $487,189.00 abandonment expense in 2006 and claimed to have abandoned the original architectural plan. It claimed that the original plans were scrapped and needed to be completely redone. Karlton/ISG noted that factors to determine whether an abandonment loss was proper: that the loss must be incurred in a business or transaction entered into for profit; the loss must arise from the sudden termination of the usefulness in the business; and the property must be permanently discarded from use or the business transaction is discontinued. In addition, testimony provided that in accordance with United States Fifth Circuit precedent, for an abandonment to be effective, the abandoning party must only manifest an intent to abandon by some overt act or statement calculated to give a third party notice of the abandonment. *See Echols v. Com'r.*, 935 F.2d 703 (5th Cir. 1991). Testimony was provided on behalf of Karlton/ISG showing that the overt act in accordance with *Echols* was when Karlton/ISG scrapped the original plans and revised the plans in a "Miami" version and hired an additional architect to complete those plans. In 2006, it claimed that both the Mississippi plan and the architectural plan for the New Orleans project were abandoned. Ambrosio testified that the plans initially completed by Mathes did not fit their concept, as they wanted as many

5

aware of the abandonment; however, Ambrosia assumed that Ed Mathes knew about the abandonment, as he had not submitted an invoice for 2008 services nor demanded payment on outstanding invoices for 2007 services for a period of almost five years and other business ventures were being discussed. Ambrosia, Spiegelman, and Studnisky engaged in separate negotiations with the Kerns and, in 2015, they formed River Street to pursue commercial and residential developments.[8]

Ed Mathes alleges that Ambrosio and Lipkins assured Mathes that "the money [is] coming, the money [is] coming." Ed Mathes was not concerned about Karlton's financial wherewithal to complete the Project as he knew and respected John Karlton from prior business deals in New Orleans and he felt that the Project "was too important" . . . "to the city, to us, [and] to the people of the Westbank."

In May 2015, Mathes filed a petition praying for a judgment against Karlton/ISG for amounts owed under the Agreement and unpaid invoices as

---

condominiums as possible to have river views. In 2007, Karlton/ISG abandoned its business plan, as Karlton/ISG began to return deposits it had received to reserve condominium units. The Mississippi River project was winding down in 2006 and expenses overlapped into the 2007 tax year; thus, an abandonment expense was taken for the Mississippi project in 2007 as well. Mathes' representatives testified that while Karlton/ISG requested changes in the design of the Project on numerous occasions, Mathes incorporated those changes in such a manner as to fit within the original principles of the Project's design in 2005 and 2006, which had been approved by the City of New Orleans and the Historic Districts and Landmarks Commission. Mathes' representatives further testified—and the district court found—that the work performed by Mathes on the Project in 2005 and 2006 resulted in the adoption of an Ordinance by the City of New Orleans that approved a zoning change for the site of the Project and also approved a residential planned community with mixed use overlay to allow the Project to proceed.

[8] The district court found that in 2008, principals of ISG Co. began efforts to develop the Project separately and at the time of the trial "it was established that some of those efforts continue to this day." Particularly, in 2014, members of ISG Co. began negotiations with Blaine Kern in the hopes of reviving some form of the Project. Members of ISG Co. entered into a purchase agreement, dated February 19, 2014, with Blaine S. Kern, Sr., L.L.C. Members of ISG Co. entered into the February 2014 Agreement with the intention of proceeding with a project (not the same as previously anticipated) on the same property envisioned in the Agreement. However, by this time, the promissory note had already prescribed. The February 2014 Agreement was signed, but Blaine Kern did not complete the agreement. In 2015, Ambrosio engaged in separate negotiations with Barry Kern for the purchase of different property owned by Barry Kern or entities he controls. River Street was formed and, on August 11, 2015, entered into a Purchase Agreement for the purchase of Westbank property. Ambrosio, managing member of River Street, executed the agreement. On May 31, 2016, River Street purchased the property from Barry Kern's entities.

reflected in the Outstanding Balance ($555,689.23) and 2013 Invoice ($478,737.50).

Mathes also named Members as additional defendants in an attempt to collect on any judgments against Karlton/ISG and to obtain a judgment finding Members solidary liable for the aforementioned debts of Karlton/ISG. In its brief, Karlton/ISG and Members argue that, applying the general rule of limited liability found in La. R.S. 12:1320 (B),[9] Members are wholly separate by law from Karlton/ISG and not responsible for debts of Karlton/ISG. Basically, they argue that the narrowly defined limited liability exceptions found in La. R.S. 12:1320(D) are exclusive[10] and a claimant can only file a cause of action against a member of an LLC for the conduct of a member or manager on behalf of the LLC under the following areas of law: (1) fraud; (2) professional duty breach; and (3) negligent or wrongful act (sometimes collectively "Statutory Exceptions).[11] They allege that Mathes did not properly file a claim under the "Fraud Exception" and did not prove Members' liability under the "Negligent or Wrongful Act Exception."

Karlton/ISG and Members further argue that courts are bound to follow *Ogea v. Merritt,* 13-1085 (La. 12/10/13), 130 So.3d 888, the seminal case interpreting La. R.S. 12:1320. Specifically, they claim that the district court should

---

[9] La. R.S. 12:1320 (B) reads: "Except as otherwise specifically set forth in this Chapter, no member, manager, employee, or agent of a limited liability company is liable in such capacity for a debt, obligation, or liability of the limited liability company." *See also* La. R.S. 12:1320 (C), which reads: "A member, manager, employee, or agent of a limited liability company is not a proper party to a proceeding by or against a limited liability company, except when the object is to enforce such a person's rights against or liability to the limited liability company."

[10] La. R.S. 12:1320 (A) reads: "The liability of members, managers, employees, or agents, as such, of a limited liability company organized and existing under this Chapter shall at all times be determined *solely and exclusively* by the provisions of this Chapter." (Emphasis added).

[11] La. R.S. 12:1320 (D) reads: "Nothing in this Chapter shall be construed as being in derogation of any rights which any person may by law have against a member, manager, employee, or agent of a limited liability company because of any fraud practiced upon him, because of any breach of professional duty or other negligent or wrongful act by such person, or in derogation of any right which the limited liability company may have against any such person because of any fraud practiced upon it by him."

have employed *Ogea*'s newly developed conceptual framework four-factor test under the Negligent or Wrongful Act Exception.

Mathes claims that the Statutory Exceptions are not exclusive and instead based its claim in equity under the judicially-created limited liability exception for corporations established in *Riggins v. Dixie Shoring Co., Inc.,* (La. 12/2/91), 590 So.2d 1164, and its progeny of LLC cases (collectively "*Riggins* Exception"). The *Riggins* Exception is often referred to as "Piercing the Corporate Veil" and includes the following two distinct set of circumstances: (1) where fraudulent or wrongful acts exist usually when a shareholder acting through the corporation practices fraud or deceit ("Alter Ego Doctrine") and (2) "when the shareholders disregard the requisite corporate formalities to the extent that the corporation ceases to be distinguishable from its shareholders" ("Corporate Footing Doctrine"). *Id.* at 1168 (citations omitted).

Mathes further claims that courts, in determining whether to invoke equity and the *Riggins* Exception, must employ the methodology used in *Riggins* based on a "totality of the circumstances" review of the following factors, which favor the application of the *Riggins* Exception: 1) commingling of corporate and shareholder funds; 2) failure to follow statutory formalities for incorporating and transacting corporate affairs; 3) undercapitalization; 4) failure to provide separate bank accounts and bookkeeping records; and 5) failure to hold regular shareholder and director meetings; and 6) any other relevant factors. *Id.* at 1168-69 (citations omitted) ("*Riggins* Methodology").

Mathes particularly alleges in its petition that Members are "jointly and severally liable"[12] with Karlton/ISG for all amounts awarded against Karlton/ISG. Mathes' allegations against Members are as follows: (1) Karlton/ISG was "a mere

---

[12] Louisiana courts have long held that joint and several liability is solidary liability. *Denoux v. Vessel Mgmt. Servs., Inc.*, 07-2143 (La. 5/21/08), 983 So.2d 84. *See infra* note 40 and accompanying text.

instrumentality and the alter ego" of Members, which completely dominated and controlled Karlton/ISG; (2) Karlton/ISG was formed for the sole and improper purpose of shielding Members from liability and lacked the ability to perform its obligations under the Agreement; and (3) when Karlton/ISG no longer served Members' needs, Members drained any and all assets and corporate opportunities from Karlton/ISG in an effort to shield those assets from creditors and avoid Karlton/ISG's contractual obligations. Mathes claimed that "the fiction of corporate separateness must be disregarded" and Members must be held "jointly and severally liable" to Mathes for the debts of Karlton/ISG.

Mathes did not use the word "fraud" or "wrongful act" in its petition but used the words "misrepresentations" and "misled" and its allegations have fraudulent, deceit, and wrongful act underpinnings against Karlton/ISG and Members. Basically, Mathes claims that misrepresentations and suppressions of the truth were made with respect to the nature of the joint business activities, the Project, and the interrelationship of limited liability entities either formed for the joint venture (Karlton/ISG), utilized by Studnicky, Spiegelman, and Karlton for the joint venture (ISG Co. and Karlton Corp.), or newly formed by Studnicky, Spiegelman, and Ambrosio (River Street). Mathes also showed at trial that Ambrosia, acting on behalf of Karlton/ISG and ISG Co., and Lipkins, acting on behalf of Karlton Corp., made misrepresentations and/or suppressions of the truth relating to payment of money owed under the Agreement.

Mathes' claims against Members are basically fraud and wrongful act claims under the equitable *Riggins* Exception as prayed for in its petition but I find that they are also found under the statutory Fraud and Negligent or Wrongful Act Exceptions. Thus, I agree with the majority's statement in footnote 10 that "[a]lthough Mathes pled the alter ego theory of piercing, '[p]iercing the corporate veil is not itself an independent [] cause of action, but rather is a means of

9

imposing liability on an underlying cause of action.'" *Peacock v. Thomas*, 516 U.S. 349, 354, (1996) (citation omitted). However, I disagree with the majority's finding of significance that "Mathes neither cited nor relied upon the statutory theory for finding a limited liability company's member personally liable codified in La. R.S. 12:1320(D) and construed by *Ogea*."

I agree with Mathes' assertion that the district court properly permitted it to present evidence of fraud at trial without objection. A party may be granted any relief to which it is entitled under the fact pleadings and evidence as long as the facts constituting the claim or defense have been alleged and proved, and the due process requirement of adequate notice to the parties of the matters to be adjudicated has been satisfied. *Miller v. Thibeaux*, 14-1107 (La. 1/28/15), 159 So. 3d 426; U.S. Const. amend. XIV; La. Const. art 1 § 2; La. C.C.P. arts. 854-862. This case does not involve disputed facts but requires reasonable inferences to be made from the undisputed business conduct of each of the parties. All parties were aware of the matters to be adjudicated at trial and proceed without objection.

At the bench trial, Mathes' expert described four indicators of fraud as follows: (1) an improper diversion of a company asset (the $600,000.00 Note and Mortgage) to the detriment of creditors and not for the benefit of Karlton/ISG but for the benefit of Karlton/ISG's principals; (2) Karlton/ISG improperly took a tax loss (abandonment loss) in 2006 and 2007; (3) in 2008, Karlton/ISG stopped operating as an independent entity as it had no financial statements, no tax returns, and no funding; and (4) Karlton/ISG failed to notify creditors or other parties of interest in the Project that the business activities had been abandoned and that Karlton/ISG no longer operated as an independent entity.

On September 26, 2018, after a bench trial, the district court ruled in favor of Mathes and against Karlton/ISG and awarded damages of $944,669.23, plus

interest[13] for breach of contract, unpaid invoices, and costs associated with the litigation. The district court also found Members solidarily liable with Karlton/ISG for all amounts awarded to Mathes. On January 11, 2019, the district court awarded Mathes $61,366.34 in costs, similarly finding Members solidarily liable with Karlton/ISG for costs. The district court found that Mathes provided sufficient evidence to prove that Karlton/ISG owed the Outstanding Balance in the amount of $555,689.23 and (2) the 2013 Invoice in the amount of $478,737.50. The court found that Karlton/ISG was allowed a deduction of $89,757.50.[14] The district court, in its Reasons for Judgment, cited *Riggins*.[15]

The district court did not specifically make a finding based on the Fraud Exception and/or the Negligent or Wrongful Act Exception and noted that "Mathes did not pray for a finding of fraud." The district court failed to recognize that a party is entitled to any relief available based on the facts pled, regardless of the specific relief requested pursuant to La. C.C.P. art. 862. The overlapping principles of fault in the equitable *Riggins* Exception and the Statutory Exceptions cause much confusion because linguistic or conceptual distinctions exist between them but any such distinction among them lacks substantive practical effect and are based, *inter alia*, on fraudulent or wrongful acts as pled by Mathes.

In its Reasons for Judgment, the district court in support of its ruling identified the following four factors, which tracked the four indicators of fraud

---

[13] Interest was awarded through May 21, 2018, at eight percent (8%) per annum, "which interest shall continue to accrue from May 22, 2018 until paid."

[14] The $89,757.50 deduction is based on the fact that Karlton/ISG paid invoice Nos. 1 and 2 in the amount of $15,157.50 and $73,880.00, respectively, for Master Planning Services, payment for which was not due until the successful sale of the condominium in Phase 1 and Phase 2.

[15] The district court, in its Reasons for Judgment, also cited *Green v. Champion Ins. Co.,* (La.App. 1st Cir. 3/5/91), 577 So.2d 249 for the propositions that another equitable exception referred to as the "Single Business Enterprise" exists to find LLC members liable for debts of an LLC: "[w]hen a group of corporations integrate their resources to achieve a common business purpose and do not operate as a separate entity, each affiliated corporation may be held liable for the debts incurred in pursuit of its business purpose" ("*Green* Exception"). Mathes never invoked the *Green* Exception and no party discussed it on appeal.

identified by Mathes' expert: (1) an "improper diversion of the $600,000.00 Note and Mortgage" for the benefit of Karlton/ISG's principals, members and affiliated entities and other evidence of co-mingling of assets; (2) an "improper tax treatment" of Karlton/ISG by its members and principals; (3) Karlton/ISG's members "failed to conduct business on a separate footing to such an extent that the company became indistinguishable" from its members; and (4) the conduct of Karlton/ISG's principals and Members misled Mathes and other creditors to their detriment.

Karlton/ISG and Members filed a timely appeal, setting forth the following assigned errors:

1. The trial court erred in finding that ISG and Karlton are solidarily liable with Karlton/ISG for all amounts awarded to Mathes pursuant to the Judgment under the alter ego/piercing the corporate veil theory of liability.

2. The trial court erred in awarding plaintiff, Mathes, a judgment in its favor against defendant Karlton/ISG in the amount of $944,669.23.

3. The trial court erred in awarding Mathes the total of $61,366.34 for costs incurred in connection with the trial of the captioned matter.

I will not address the assignments of error in the above-referenced order. I will initially discuss the second and third assignments of error, and thereafter, assignment of error one.

## STANDARD OF REVIEW

The Louisiana Constitution provides that the appellate jurisdiction of a court of appeal extends to facts and law. La. Const. Art. 5, § 10. Questions of fact are reviewed under the manifest error or clearly wrong standard. *Sassone v. Doe*, 11-1821, pp. 3-4 (La.App. 4 Cir. 5/23/12), 96 So.3d 1243, 1246 (quoting *Rosell v. ESCO,* 549 So.2d 840, 844-45 (La. 1989)). Mixed questions of law and fact are also reviewed under the manifest error or clearly wrong standard. *Chimneywood*

12

*Homeowners Ass'n, Inc. v. Eagan Ins. Agency, Inc.,* 10-0368, 10-0369, p. 5 (La.App. 4 Cir. 2/2/11), 57 So.3d 1142, 1146 (citing *CII Carbon, L.L.C. v. Nat'l Union Fire Ins. Co. of Louisiana, Inc.,* 05-0071, p. 8 (La.App. 4 Cir. 8/17/05), 918 So.2d 1060, 1065). Questions of law are reviewed *de novo* "without deference to the legal conclusions of the courts below." *Durio v. Horace Mann Ins. Co.,* 11-0084, p. 14 (La. 10/25/11), 74 So.3d 1159, 1168.

When findings of fact are based on determinations regarding the credibility of witnesses, the manifest error or clearly wrong standard demands great deference to the trier of fact's findings; "for only the factfinder can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding and belief in what is said." *Sassone,* 96 So.3d at 1246 (quoting *Rosell v. ESCO,* 549 So.2d 840, 844-45 (La. 1989)). To reverse a factfinder's factual determinations, the appellate court (1) must find from the record that a reasonable factual basis does not exist for the finding of the district court; and (2) must further determine that the record establishes that the finding is clearly wrong. *Kaltenbaugh v. Bd. of Supervisors*, 18-1085, pp. 6-7 (La. App. 4 Cir. 10/23/19), 282 So.3d 1133, 1138-39 (citation omitted). "If the trial court's findings are reasonable in light of the record reviewed in its entirety, the appellate court may not reverse." *Arabie v. CITGO Petroleum Corp.,* 10-2605, p. 4 (La. 3/13/12), 89 So.3d 307, 312 (citing *Sistler v. Liberty Mutual Ins. Co.,* 558 So.2d 1106, 1112 (La. 1990)). As a factfinder, the district court may accept or reject, in whole or in part, any witness's testimony including expert witnesses. *Dudenhefer v. Louisiana Citizens Property Ins. Corp.*, 19- 0387, p. 3 (La.App. 4 Cir. 9/25/19), 280 So.3d 771, 775; *Levine v. Allstate Ins. Co.*, 17-0896, p. 3 (La.App. 4 Cir. 4/18/18), 243 So.3d 1286, 1288. Under the manifest error or clearly wrong standard, the appellate court "cannot reweigh the evidence or substitute the factual findings to decide the case differently." *Dudenhefer,* 280 So.3d at 775 (citations omitted).

As the Louisiana Supreme Court succinctly stated in *Rosell*:

> When findings are based on determinations regarding the credibility of witnesses, the manifest error-clearly wrong standard demands great deference to the trier of fact's findings; for only the factfinder can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding and belief in what is said. Where documents or objective evidence so contradict the witness's story, or the story itself is so internally inconsistent or implausible on its face, that a reasonable fact finder would not credit the witness's story, the court of appeal may well find manifest error or clear wrongness even in a finding purportedly based upon a credibility determination. But where such factors are not present, and a factfinder's finding is based on its decision to credit the testimony of one of two or more witnesses, that finding can virtually never be manifestly erroneous or clearly wrong. (citations omitted).

549 So.2d at 844-45.

As to questions of law, "the standard of review of appellate courts in reviewing a question of law is simply whether the court's interpretive decision is legally correct." *Glass v. Alton Ochsner Medical Foundation,* 02-0412, p. 3 (La.App. 4 Cir. 11/6/02), 832 So.2d 403, 405 (citation omitted). "[W]hen the court of appeal finds that a reversible error of law or manifest error of material fact was made in the trial court, it is required, whenever possible, to redetermine the facts *de novo* from the entire record and render a judgment on the merits." *Ferrell v. Fireman's Fund Ins. Co.,* 94-1252, pp. 3-4 (La. 2/20/95), 650 So.2d 742, 745 (citations omitted).

In *Wegener v. Lafayette Ins. Co.*, 10-0810, 10-0811, pp. 19-20 (La. 3/15/11), 60 So.3d 1220, 1233-34, the Supreme Court explained:

> Typically where such legal errors have interdicted the fact finding process, if the record is otherwise complete, the appellate court should make its own independent *de novo* review of the record. *Landry v. Bellanger*, 2002-1443 (La. 5/20/03), 851 So.2d 943, 954; *Ferrell v. Fireman's Fund Ins. Co.*, 94-1252 (La. 2/20/95), 650 So.2d 742, 745; *Ragas v. Argonaut Southwest Insurance Co.*, 388 So.2d 707, 708 (La. 1980). However, we have also recognized that *de novo* review is not the best course of action in every case. *Ragas*, 388 So.2d at 708. This Court explained in *Ragas*:
>
> > This is not to say, and *Gonzales* [*v. Xerox Corp*., 320 So.2d 163 (La. 1975),], should not be read to require, that

14

the appellate court must find its own facts in every such case. There are cases where the weight of the evidence is so nearly equal that a first-hand view of witnesses is essential to a fair resolution of the issues. The appellate court must itself decide whether the record is such that the court can fairly find a preponderance of the evidence from the cold record. Where a view of the witnesses is essential to a fair resolution of conflicting evidence, the case should be remanded for a new trial. *Ragas*, 388 So.2d at 708. [footnote omitted.]

The authority for an appellate court to remand a case to the trial court for proper consideration, where it is necessary to reach a just decision and to prevent a miscarriage of justice, is conferred by La. C.C.P. art. 2164. [footnote omitted]. Whether a particular case should be remanded is a matter which is vested largely within the court's discretion and depends upon the circumstances of the case. *See Alex v. Rayne Concrete Service*, 2005-1457 (La. 1/26/07), 951 So.2d 138, 155.

## DISCUSSION

I first address the district court's finding of breach of contract and unpaid invoices as well as the court's awards of damages and costs against Karlton/ISG.

The district court awarded Mathes the amount of $555,689.23 of the Outstanding Balance plus the amount of $478,737.50 from the 2013 Invoice, subject to a deduction of $89,757.50, for a total award of $944,669.23. Karlton/ISG argues that "[t]he district court erred in ruling in favor of Mathes and against Karlton/ISG" because Mathes failed to prove the amounts owed and to mitigate damages by unreasonably accruing an outstanding balance. I disagree.

After reviewing the record and applicable law, I agree with the majority and I would also affirm the district court's award for breach of contract and unpaid invoices against Karlton/ISG in the amount of $944,669.23, representing the 2013 Invoice of $478,737.50, the outstanding balance of $555,689.23, and a deduction of $89,757.50. I find that the district court did not err in holding that Mathes provided sufficient evidence to prove that these amounts were owed.

Karlton/ISG further contends that Mathes was required to take steps to mitigate its damages but failed to do so by waiting five years to invoice for

15

services rendered and to demand payment on outstanding balances, which allowed the balance to unreasonably accrue. This court has long recognized the well-settled doctrine of mitigation as codified in La. C.C. art. 2002 and applicable to tort and contract law in Louisiana. *Bd. of Supervisors of Louisiana State Univ. v. Gerson*, 17-0229, 17-0296, p. 24 (La.App. 4 Cir. 11/14/18), 260 So.3d 634, 652, *writ denied*, 18-2054 (La. 2/25/19), 266 So.3d 292. La. C.C. art. 2002 provides "[a]n obligee must make reasonable efforts to mitigate the damage caused by the obligor's failure to perform. When an obligee fails to make these efforts, the obligor may demand that the damages be accordingly reduced."

While an injured party has a duty to mitigate his damages, this duty exists only if it is reasonable to do so. [16] "In mitigating damages, an injured party should exercise the degree of care such as would be taken by an ordinarily prudent individual under the same or similar circumstances." *Id.* (citations omitted). "The burden rests with the wrongdoer to show that the victim failed to mitigate damages." *Bd. of Supervisors,* 260 So.3d at 652 (citation omitted).

In the present case, the record reveals that evidence from both parties was introduced and considered by the district court concerning mitigation of damages. There is nothing in the record to support the conclusion that Mathes had a duty to mitigate under Article 2002 with respect to the breach of contract and unpaid invoices claims. Mathes did not have a duty to expeditiously seek legal recourse and pursue collection proceedings as a judgment creditor. Nonetheless, as to Mathes, there are risks and legal consequences of not pursuing actions against Karlton/ISG until after the Project stalled and the Note prescribed; thus, diminishing options are available to Mathes as a judgment creditor and an

---

[16] *Merlin v. Fusilier Constr. Inc.,* 00-1862, p. 9 (La.App. 5 Cir. 5/30/01), 789 So.2d 710, 716 (citation omitted).

16

impoverished obligee against an obligor.[17]  Likewise, Mathes could pursue River Street for recovery of assets if in fact River Street used Mathes' architectural work product.  However, Article 2002 duty to mitigate does not apply under these circumstances.

To reverse a factfinder's determinations, the appellate court must find a reasonable factual basis in the record to support the finding of the district court and determine that the record establishes that the finding is clearly wrong (manifest error).  *Kaltenbaugh,*  282 So.3d at 1138-39 (citation omitted).  A review of the record reveals that the district court was not clearly or manifestly erroneous. I find no abuse of the district court's discretion and, thus, assignment of error two has no merit.

Karlton/ISG next argues in assignment of error three that "[t]he district court erred in ruling in favor of Mathes and against Karlton/ISG awarding Mathes the amount of $61,366.34 for costs incurred in connection with the trial of the captioned matter."  I concur in the results of the majority opinion that the district court did not abuse its discretion in awarding costs of the trial.

I next address assignment of error one relative to the finding of solidary liability against Members for the above-mentioned debts of Karlton/ISG. Karlton/ISG argues that the district court erred in finding Members solidarily liable with Karlton/ISG reasoning that the district court erroneously applied only *Riggins* Methodology as opposed to the Statutory Exceptions.  I agree.  I find that the district court erred, as a matter of law, by failing to recognize that the Statutory Exceptions in La. R.S. 12:1320 supersede and incorporate the *Riggins* Exception.

Karlton/ISG and Members further argue that the court erred in applying the *Riggins* Methodology and was bound to employ the *Ogea* Methodology.  I agree.  I

---

[17] See e.g. La. C.C. art. 2036; La. C.C. art. 2044; La. C.C. art. 2298; La. C.C.P. art. 3541, *et seq.*; La. C.C.P. art. 3501, *et seq.*; La. C.C.P. art. 2451, *et seq.*

therefore find that the district court erred as a matter of law and a *de novo* review is warranted. After my *de novo* review of the record and applicable law, I would reverse those portions of the judgments that find Members solidarily liable for the following reasons:

I will first address a choice of law issue because the majority finds that the result in this case does not differ depending on which state's law applies and both Florida and Louisiana courts similarly invoke the same jurisprudential limited liability exception for LLCs.[18] I find that Louisiana law applies because the parties acquiesced in its application. Even if Florida law applies, the Court explained in *Thomas v. Bridges,* 13-1855, p. 8 (La. 5/7/14), 144 So.3d 1001, 1008 that if no liability existed on the basis of the foreign LLC's laws, a member of a foreign LLC could still be assessed for liability under La. R.S. 12:1320(D).

Louisiana Revised Statute 12:1342 states the "laws of the state or other jurisdiction under which a foreign limited liability company is organized shall govern its organization, its internal affairs, and the liability of its managers and members that arise solely out of their positions as managers and members." Karlton/ISG was organized in Florida; thus, Florida law would normally apply with respect to liability of Members pursuant to La. R.S. 12:1342. However, the district court and parties failed to address this choice of law issue or contest the

---

[18] I disagree with the majority that Florida and Louisiana similarly invoke equity. Compare La. R.S. 12:1320 ("liability of members, managers, employees, or agents, as such, of a limited liability company organized and existing under this Chapter shall at all times be determined solely and exclusively by the provisions of this Chapter") and Fla. Stat. Ann. § 605.0111 (West) ("the principles of law and equity, including the common law principles relating to the fiduciary duties of loyalty and care, supplement this chapter."). Under the civilian tradition, judicial decisions are not intended to be an authoritative source of law in Louisiana. *See* A.N. Yiannopoulos, *Louisiana Civil Law System* § 35, p. 53 (1977). The courts are bound to proceed according to equity only when no rule for a particular situation can be derived from legislation or custom. La. C.C. art 4. Compare also La. R.S. 12:1320(D) and Fla. Stat. Ann. § 605.04093 (West).

application of Louisiana law.[19]  The absence of an assignment of error or lack of

objection to the district court's choice of law application in the case *sub judice*

would not prohibit this Court from addressing and clarifying the issue *sua sponte*

on appeal.  *Wooley v. Lucksinger*, 09-0571, p. 62, (La. 4/1/11), 61 So.3d 507, 562.

> Without doubt, an appellate court has the authority to raise an issue *sua sponte* on appeal.  The state constitution authorizes the appellate jurisdiction of a court of appeal in civil matters to extend to law and facts.  La. Const. art. 5, § 10(A) and (B).  La. C.C.P. art. 2129 specifically provides: "[a]n assignment of error is not necessary in any appeal."  La. C.C.P. art. 2164 provides an appellate court "shall render any judgment which is just, legal, and proper upon the record on appeal."  Likewise, the uniform rules of the appellate courts require that an issue be submitted in an assignment of error, after first being raised in the district court, "*unless the interest of justice clearly requires otherwise.*"  Uniform Rules Courts of Appeal, Rule 1–3 (emphasis added).

*Id.* at 562–63.

"Determining the proper choice-of-law law to be applied to an issue is a

question of law for which this court has the plenary and unlimited constitutional

power and authority to review *de novo*."  *Id.* at 562 (footnote omitted).  I find that

the parties acquiesced in the application of Louisiana law.  The parties argued

Louisiana law throughout this lawsuit, and the district court applied Louisiana law

with respect to the liability of Members.  Moreover, the Contract between Mathes

and Karlton/ISG states that Louisiana law applies.[20]

---

[19] Mathes briefed the issue in the lower court in its proposed findings of fact and conclusions of law, asserting that the applicable laws relating to jurisprudential limited liability exception of LLCs are the same under both Florida and Louisiana law.

[20] In Article 9.1 of the Agreement between Mathes and Karlton/ISG, the parties agreed, "This Agreement shall be governed by the law of the principal place of business of the Architect [Mathes] unless otherwise provided in Article 12."  I note that no evidence exists as to the intent of Mathes and Karlton/ISG as to this provision or as to whether the provision applies to Members, who are not part of the contract.  Nonetheless, parties can agree to choice of law issues.  For instance, contractual forum selection clauses are *prima facie* valid and enforced in Louisiana, "unless the resisting party can 'clearly show that enforcement would be unreasonable and unjust, or that the clause was invalid for such reasons as fraud or overreaching … [or that] enforcement would contravene a strong public policy of the forum in which the suit is brought, whether declared by statute or by judicial decision.'"  *Creekstone Juban I, LLC v. XL Insurance America, Inc.,* 18-0748, p. 5 (La. 5/8/19), 282 So.3d 1042, 1046 (quoting *Shelter Mutual Ins. Co. v. Rimkus Consulting Group, Inc. of La.,* 13-1977, pp. 16-17 (La. 7/1/14), 148 So.3d 871, 881) (citation omitted).

Mathes, Karlton/ISG, and Members applied Louisiana law to the damages and costs resulting from the breach of contract and for which Members were held liable. They also applied Louisiana law in the district court and throughout this appeal, as did the district court in finding Members solidarily liable with Karlton/ISG. Thus, I find that Louisiana law as to principles of fault applies when determining liability of Members.

Applying Louisiana law, which includes "statutory, jurisprudential, or [any law] arising from general principles of fault,"[21] I find that the district court erred, as a matter of law, by failing to recognize that the Statutory Exceptions supersede and incorporate the *Riggins* Exception and by failing to follow the *Ogea* case which provided the following method of discerning the law with respect to the Statutory Exceptions ("*Ogea* Methodology"): (1) an analysis on the Fraud Exception should be based on the longstanding definition of fraud found in La. C.C. art. 1953 and existing laws noting that "this definition of fraud has remained essentially unchanged from that contained in Article 1847(6) of the Civil Code of 1870"; (2) an analysis on Professional Duty Breach Exception should begin with the "clearly defined technical meaning [of professional] within the law of business entities;"[22] and (3) an analysis of the Negligent or Wrongful Act Exception should be based on *Ogea*'s newly developed conceptual framework "to accord the terms 'negligent' act and 'wrongful act' their commonly understood meaning while also respecting the general limitation of liability" by applying four factors, which

---

[21] *Ogea v. Merritt*, 13-1085 (La. 12/10/13), 130 So. 3d 888, 905 (citation omitted).

[22] The Court in supporting this method of adopting business law provided in the following quote from James S. Holliday, Jr., & H. Bruce Shreves, *Louisiana Practice Series: Louisiana Construction Law* § 1:9 pp. 10–11 (2013): "'Since 1964, professional law corporations have been possible in Louisiana. In 1968, with recodification of Louisiana's corporate laws, professional medical corporations were also permitted. Since then, Louisiana has enacted statutory provisions for professional corporations for the dental, accounting, chiropractic, nursing, architectural, optometry, psychology, veterinary medicine and architectural-engineering professions.'" (Footnotes omitted.) *Id.* at 898-99. I find Mathes introduced no evidence that Karlton/ISG or Members were one of these legislatively recognized professions; thus, this exception does not apply in the case *sub judice*.

include a Tort Factor, Criminal Factor, Contract Factor, and Capacity Factor explaining that a "court is to evaluate each situation on a case-by-case basis and consider each of the above factors when determining whether the general rule of limited liability must yield to the exception for a member's 'negligent or wrongful act.'" *Ogea,* 130 So. 3d at 898-905.

Although Mathes correctly points out that *Riggins* has not been overruled,[23] Mathes and the district court failed to recognize that this court, as well as a number of state and federal courts, have applied the *Ogea* Methodology to the issue of LLC member liability [24] and our court has noted the limitations of *Riggins* when applied to LLCs.[25]

---

[23] Mathes also points out that *Riggins* was cited approvingly by this court in *Hickey v. Angelo*, 18-0550, p. 13 (La.App. 4 Cir. 5/29/19), 274 So.3d 47, 56. Mathes' reliance is misplaced. *Hickey* addressed a medical corporation, not a LLC. The *Ogea* Court examined the statutory scheme addressing LLCs and clarified, *inter alia*, the framework of the Negligent or Wrongful Act Exception by using a four-part inquiry and the proper fraud analysis under the Fraud Exception.

[24] *See, e.g., Hohensee v. Turner,* 12-0796, p. 14 (La.App. 4 Cir. 4/22/15), 216 So.3d 883, 891; *Streiffer v. Deltatech Construction, LLC,* 18-0155, pp. 8-9 (La.App. 4 Cir. 10/10/18), ---So.3d---; *Anfretti Sports Marketing Louisiana, LLC v. NOLA Motorsports Host Committee, Inc,* 147 F.Supp.3d 537, 563 (E.D. La. 2015); *Korrapati v. Augustino Brothers Constr. LLC*, 19-426, p. 3 (La. App. 5 Cir. 7/31/20), ---So.3d---, 2020 WL 4381850, *10; *Nicholas v. BBT Construction Management, LLC,* 15-1009 (La.App. 1 Cir. 12/23/15), 2015 WL 9466864, *2; *Wilson v. Two Sd, LLC,* 15-0959, p. 14 (La.App. 1 Cir. 2/23/15), 186 So.3d 103, 114; *J & J Sports Productions, Inc. v. Liquor US UO, LLC*, 18-988 (E.D. La. 2019), 2019 WL 527755, *5-6 (*unpub.*); *FUFC, LLC v. Excel Contractors, LLC*, 18-1095, (M.D. La. 2020), 2020 WL 1443039, *8-9 (*unpub.*); *Southern Coil Tubing, Inc.* v. *Oracle Gas, LLC,* 17-473, pp. 10-12 (La.App. 3 Cir. 12/13/17), 258 So.3d 759, 767-68. In *An Erny Girl, LLC v. BCNO 4 LLC,* 18-0360 (La.App. 4 Cir. 9/26/18, 257 So.3d 212, where the plaintiff appealed a grant of an exception of no cause of action, this court applied the analysis in *Ogea* but remanded the case to allow the plaintiff to amend the petition. In *Payphone Connection Plus Inc. v. Wagners Chef, LLC*,19-0181 (La.App. 4 Cir. 7/31/19), 276 So.3d 589, this court cited *Ogea*, but found "no allegations consistent with an attempt by Payphone to 'pierce the corporate veil.'" *Id.,* 19-0181, p. 10, 267 So.3d at 596.

[25] *Riggins* is limited when analyzing the limited liability protections of LLCs. In pre-*Ogea* cases from this court, such as *ORX Res., Inc. v. MBW Expl., L.L.C.,* 09-0662 (La.App. 4 Cir. 2/10/10), 32 So.3d 931 and *Breaux v. Vieux Carre' Mortgage, L.L.C.,* 07-1443, 2008 (La. App. 4 Cir. 2008) WL 8922922, *3, we recognized that the nature of LLCs, as closely held entities, limit the applicability of the *Riggins Methodology*. For example, "[u]nder Louisiana LLC law, members or managers of LLCs do not have to hold meetings, keep minutes or act through formal resolutions." *ORX Res., Inc. v. MBW Expl., L.L.C.,* 09-0662, p.11 (La.App. 4 Cir. 2/10/10), 32 So.3d 931, 937. In *Breaux*, we stated:

> Louisiana's LLC laws do not recognize the "alter ego" doctrine. An LLC need not follow the formalities required of corporations in order to maintain its separate legal existence. Unless the LLC's articles of organization or a written operating agreement provides otherwise, the members or managers take action by a majority vote. La. R.S. 12:1316;

I note that this court has employed the *Riggins* Methodology prior to the Louisiana Supreme Court's development and explanation of the methodology set forth in O*gea* for determining limited liability exceptions of LLCs under the Negligent or Wrongful Act Exception.[26] In fact, our court, prior to *Ogea*, had difficulty reconciling the *Riggins* Methodology and applying it to LLC cases and experienced tension between the prior applications of piercing the corporate or company veil and the language of La. R.S. 12:1320.[27] Thus, I find that the district court erred as a matter of law by failing to apply the *Ogea* Methodology.

Questions of law are reviewed *de novo* "without deference to the legal conclusions of the courts below." *Durio*, 74 So.3d at 1168. As to questions of law, "the standard of review of an appellate court is simply whether the court's interpretive decision is legally correct." *Ohm Lounge, L.L.C. v. Royal St. Charles Hotel, L.L.C.,* 10-1303, p. 4 (La.App. 4 Cir. 9/21/11), 75 So.3d 471, 474 (citing *Glass v. Alton Ochsner Medical Foundation,* 02-0412, p. 3 (La.App. 4 Cir. 11/6/02), 832 So.2d at 405). "[I]f the decision of the trial court is based upon an erroneous application of law rather than on a valid exercise of discretion, the decision is not entitled to deference by the reviewing court." *Id.* at 474 (citing *Pelleteri v. Caspian Group Inc.,* 02-2141, pp. 6-7 (La.App. 4 Cir. 7/2/03), 851

---

La. R.S. 12:1318. Furthermore, Louisiana LLC law specifically prohibits imposing membership liability for failure to follow corporate formalities. *See* La. R.S. 12:1320; *See also, In Re Provenza*, 316 B.R. 225, 230 (Bankr.E.D.La.2003).

[26] *See e.g. ORX Res., Inc. v. MBW Expl., L.L.C.,* 09-0662 (La.App. 4 Cir. 2/10/10), 32 So.3d 931("the provisions of La. R.S. 12:1320(D) provide for the piercing of a LLC's veil when the situation so warrants" . . . noting that to "'have meaning within the entire statute, the phase 'or other negligent or wrongful act by such person' must refer to acts done outside one's capacity as a member, manger, employee, or agent of the limited liability company'" and a "discussion of the *Riggins* factors will resolve how Mr. Washauer can be held personally liable for MBW's indebtedness to ORX").

[27] *See supra* note 25. The type of conduct that triggers LLC member liability under the *Riggins* Methodology was not often consistent or uniform and was vague in its application unlike the comprehensive and LLC applicable *Ogea* Methodology.

So.2d 1230, 1235). Because the issue herein concerns an application of law, *de novo* review is appropriate.

After my *de novo* review, I would reverse the district court's finding of solidary liable against Members.[28] I find that Mathes failed to prove that the circumstances in this case are exceptional as to allow for LLC member liability under either the *Ogea* Methodology in applying the Fraud Exception or the Negligent or Wrongful Act Exception or under the principles of fault recognized in *Riggins* for the following reasons:

The Civil Code establishes only two sources of law in Louisiana: legislation and custom. *See* La. C.C. art. 1. Within these two categories, legislation is superior to custom and will supersede it in every instance. *See* La. C.C. art. 3. Judicial decisions, on the other hand, are not intended to be an authoritative source of law in Louisiana. *See* A.N. Yiannopoulos, *Louisiana Civil Law System* § 35, p. 53 (1977). When no rule for a particular situation can be derived from legislation or custom, the court is bound to proceed according to equity. To decide equitably,

---

[28] Nonetheless, based on a manifest error review and on an application of either the *Riggins* Exception and its progeny cases relating to LLCs or the Statutory Exceptions in La. R.S. 12:1320(D), particularly, the Fraud Exception and Negligent or Wrongful Act Exception, I find that the district court's inferences are not reasonable in light of the record before us and reversal is also warranted under this standard. Mixed questions of law and fact are also reviewed under the manifest error standard. *Chimneywood Homeowners Ass'n, Inc. v. Eagan Ins. Agency, Inc.,* 10-0368, 10-0369, p. 5 (La.App. 4 Cir. 2/2/11), 57 So.3d 1142, 1146 (citing *CII Carbon, L.L.C. v. Nat'l Union Fire Ins. Co. of Louisiana, Inc.,* 05-0071, p. 8 (La.App. 4 Cir. 8/17/05), 918 So.2d 1060, 1065). "If the trial court's findings are reasonable in light of the record reviewed in its entirety, the appellate court may not reverse." *Arabie v. CITGO Petroleum Corp.,* 10-2605, p. 4 (La. 3/13/12), 89 So.3d 307, 312 (citing *Sistler v. Liberty Mutual Ins. Co.,* 558 So.2d 1106, 1112 (La.1990)). The district court's findings are clearly wrong, especially considering the conduct of principals of Mathes, Karlton/ISG, and Members in light of the dynamics and nature of the Project and the failed joint business venture. While recognizing that the requisite intent of the principals of Karlton/ISG and/or Members to defraud Mathes or perform a wrongful act against Mathes through the use of limited liability entities may be inferred from the totality of the circumstances and need not be proven by direct evidence, such inferences must be reasonable. Inferences must take into consideration the legislative mandate that individuals are allowed to limit their individual liability through the LLC business form or other limited liability entities. Likewise, individuals are allowed to create minimally capitalized LLCs, and all parties (obligors and obligees) assume business risks and have consequences of legal recourse strategies, including the decisions to pursue legal actions or delay legal actions. The failure of the district court to take into account these considerations makes the court's inferences unreasonable, which warrants a reversal under a manifest error review. This case does not involve disputed facts but required the court to make reasonable inferences from the undisputed business conduct of each of the parties and the nature of the Project.

resort is made to justice, reason, and prevailing usages. La. C.C. art 4. Under the civilian tradition, while a single decision is not binding on our courts, when a series of decisions form a "constant stream of uniform and homogenous rulings having the same reasoning," *jurisprudence constant* applies and operates with "considerable persuasive authority."[29] James L. Dennis, *Interpretation and Application of the Civil Code and the Evaluation of Judicial Precedent,* 54 La. L.Rev. 1, 15 (1993). Prior holdings by this court are persuasive, not authoritative, expressions of the law. Yiannopoulos, *supra,* at § 35, p. 54. Thus, it is only when courts consistently recognize a long-standing rule of law outside of legislative expression that the rule of law will become part of Louisiana's custom under La. C.C. art. 3 and be enforced as the law of the state, and courts will be allowed to resort to equity. *See* La. C.C. arts. 3 and 4.

In Louisiana, "courts must begin every legal analysis by examining primary sources of law: the State's Constitution, codes, and statutes." *Powell v. DeHyCo, Inc.*, 2001-1029 (La. App. 3 Cir. 2/13/02), 815 So. 2d 1032, 1034 (citing *Prytania Park Hotel, Ltd. v. General Star Indem. Co*., 97–30635 (5th Cir. 6/17/99), 179 F.3d 169). The courts then can look to persuasive or secondary sources of law, such as jurisprudence, doctrine, conventional usages, and equity, to guide them in reaching a decision in the absence of legislation and custom. The courts must then employ the appropriate methodology first looking to the Louisiana Supreme Court for guidance. The law is well settled that this appellate court is bound to follow the decisions of our Supreme Court. *See Giarrusso v. New Orleans Book Mart, Inc.,*

---

[29] The case law on piercing the corporate veil, in terms of limited liability companies, is sparse and not uniform. *Compare Riggins* and progeny with *Ogea. Ogea v. Merritt, 13-1085 (La. 12/10/13), 130 So. 3d 888; Riggins v. Dixie Shoring Co*., 590 So.2d 1164 (La. 1991); *See An Erny Girl, L.L.C. v. BCNO 4 L.L.C*., 18-0360, p. 9 (La. App. 4 Cir. 9/26/18), 257 So. 3d 212, 220; *see also Payphone Connection Plus, Inc. v. Wagners Chef, LLC,* 19-0181, p. 10 n.14 (La. App. 4 Cir. 7/31/19), 276 So. 3d 589, 596; *ORX Res., Inc. v. MBW Expl., L.L.C.,* 09-0662, p. 7 (La. App. 4 Cir. 2/10/10), 32 So. 3d 931, 935.

(La.App. 4 Cir. 12/10/74), 304 So.2d 734; *D'Antoni v. D'Antoni,* (La.App. 4 Cir. 5/16/83), 432 So.2d 926. Accordingly, I must rely on the *Ogea* Methodology.

In 1992, the Louisiana Legislature enacted Chapter 22, "Limited Liability Companies," comprised of R.S. 12:1301 through 1369, which, *inter alia,* authorized limited liability companies. "[T]he personalities of an L.L.C. and its members are wholly separate by law." *Nunez v. Pinnacle Homes, L.L.C.*, 15-0087, p. 5 (La. 10/14/15), 180 So.3d 285, 289 (citation omitted). To promote business, "the legislature intended to shield individual members, managers, and employees of an L.L.C. from liability, *albeit* with certain exceptions." *Id.* To that end, the legislature established "narrowly defined" limited liability exceptions to the general rule of limited liability. *Id.*

La. R.S. 12:1320 provides:

A. The liability of members, managers, employees, or agents, as such, of a limited liability company organized and existing under this Chapter shall at all times be determined solely and exclusively by the provisions of this Chapter.

B. Except as otherwise specifically set forth in this Chapter, no member, manager, employee, or agent of a limited liability company is liable in such capacity for a debt, obligation, or liability of the limited liability company.

C. A member, manager, employee, or agent of a limited liability company is not a proper party to a proceeding by or against a limited liability company, except when the object is to enforce such a person's rights against or liability to the limited liability company.

D. Nothing in this Chapter shall be construed as being in derogation of any rights which any person may by law have against a member, manager, employee, or agent of a limited liability company because of any fraud practiced upon him, because of any breach of professional duty or other negligent or wrongful act by such person, or in derogation of any right which the limited liability company may have against any such person because of any fraud practiced upon it by him.

I find that various legal options were available to Mathes[30] and rules "can be derived from legislation" that applies to the particular circumstances in this case, particularly La. R.S. 12:1320(D). This case is not one in which the court must resort to equity[31] but one regulated by the legislature with the clear intent "to promote business in the state by limiting personal liability for some debts incurred or acts performed on behalf of business entities . . . *albeit* with certain exceptions." *Nunez*, 180 So.3d at 289.

Nonetheless, I recognize that while linguistic or conceptual distinctions exist between the equitable *Riggins* Exception and the statutory Fraud Exception and Negligent or Wrongful Act Exception, any such distinction among them lacks substantive practical effect and are based, *inter alia*, on fraudulent or wrongful acts. The district court erred in failing to recognize this distinction without a difference and basing its judgment solely on the *Riggins* Exception[32] and by not following the *Ogea* Methodology.

As required by *Ogea*, an analysis as to the applicability of the Fraud Exception, which includes any claim of fraud such as those found in the *Riggins* Exception and as pled by Mathes, should be based on the longstanding definition of fraud found in La. C.C. art.1953 and existing laws noting that "this definition of fraud has remained essentially unchanged from that contained in Article 1847(6) of the Civil Code of 1870." *Ogea*, 130 So. 3d at 898.

---

[30] *See supra* note 17 and accompanying text.

[31] The applicability of a jurisprudential limited liability exception is determined on a case-by-case basis as it is not statutorily imbedded in the civilian tradition, is a rare exception, and applies in the case of fraud or certain other exceptional circumstances, so that creditors may have an equitable remedy when they are not afforded a statutory remedy. *Dole Food Co. v. Patrickson,* 538 U.S. 468, 123 S. Ct. 1655, 155 L. Ed. 2d 643, 188 A.L.R. Fed. 661 (2003).

[32] Similar to the *Riggins* Exception, while a linguistic or conceptual distinction may exist between the equitable *Green* Exception and the statutory Fraud Exception and Negligent or Wrongful Act Exception, any such distinction lacks substantive practical effect. The district court did not recognize this distinction without a difference and cited the *Green* Exception.

> Louisiana's most longstanding legislative compilation, the Civil Code, provides the following definition: "Fraud is a misrepresentation or a suppression of the truth made with the intention either to obtain an unjust advantage for one party or to cause a loss or inconvenience to the other. Fraud may also result from silence or inaction." La. C.C. art.1953. This definition of fraud has remained essentially unchanged from that contained in Article 1847(6) of the Civil Code of 1870. *See* La. C.C. art.1953, Revision Comment–1984, comment (a). It is appropriate to draw from such a longstanding definition because, when the legislature enumerated the term "fraud" but did not define "fraud" in La. R.S. 12:1320, "this Court must assume the Legislature was aware of existing laws on the same subject." *See Foti v. Holliday,* 09–0093, p. 6 (La. 10/30/09), 27 So.3d 813, 817.

*Ogea,* 130 So. 3d at 897-98.

This court has applied a fraud analysis in a pre-*Ogea* case, such as in *ORX Res., Inc. v. MBW Expl., L.L.C.*, 09-0662, p. 12 (La. App. 4 Cir. 2/10/10), 32 So. 3d 931, 938, and in a post-*Ogea* case, such as in *Syzygy Const., LLC v. McKey*, 14-0745, p. 6 (La. App. 4 Cir. 12/10/14), 156 So.3d 763, 768. In *Orx*, after a review of the Negligent or Wrongful Act Exception and application of the *Riggins* Methodology, this court found Mr. Washauer, a member of MBW, L.L.C. ("MBW"), liable under general principles of fault that "prevent the use of the LLC form to defraud creditors." 32 So. 3d at 935. The court found that Mr. Washauer comingled MBW funds with member's funds; commingling occurred because MBW was undercapitalized and did not have a separate bank account to conduct its affairs; and at the time the member signed the operating agreement, MBW was not recognized as an LLC and did not exist. *Id*. at 937-38. The court explained, "MBW did not exist until July 20, 2005, when said statutory formalities were met." *Id*. at 937. "While Mr. Washauer signed the JOA [Joint Operating Agreement] (in January of 2003) and the Participation Agreement (in December of 2004), MBW did not exist, and this evidences that he did not observe statutory formalities in

27

creating MBW." *Id.* The court concluded "Mr. Washauer used MBW as a shell and tried to avoid paying a legitimate debt of the LLC." *Id*. at 935.

*Orx* is distinguishable from the case *sub judice*. Substantial capital contributions were initially made to Karlton/ISG as evidenced by the undisputed fact that Mathes was paid over a million dollars for services rendered on the Project during the first three years of the joint business venture between Karlton Corp. and ISG Co. This does not demonstrate undercapitalization to defraud creditors as found in *Orx*. Also, during this earlier time period pertinent to my analysis, Karlton/ISG operated as an independent entity as it had financial statements, tax returns, and funding. Mathes failed to prove that Members used Karlton/ISG as a shell entity, that they used Karlton/ISG to avoid paying a debt of Karlton/ISG, or that they used the LLC form to defraud Mathes as a creditor, as in *Orx*.

In *Syzygy*, this court held that an individual member of an LLC could not be held liable for fraud due to a lack of evidence of misrepresentation finding that the claimant failed to demonstrate that a member of an LLC fraudulently induced the creditor to contract or intentionally misrepresented or suppressed the truth regarding its ability to perform under the contract. *Id.*

Similar to *Syzygy*, Mathes failed to demonstrate that anyone fraudulently induced it to contract or intentionally misrepresented or suppressed the truth regarding Karlton/ISG's ability to perform under the Agreement during pertinent time periods. Fraudulent intent, or the specific intent to deceive, is a necessary and inherent element of fraud. *Sun Drilling Prod. Corp. v. Rayborn*, 00-1884 (La. App. 4 Cir. 10/3/01), 798 So. 2d 1141, 1152, *writ denied*, 01-2939 (La. 1/25/02), 807 So. 2d 840. "[W]hile fraud may indeed result from a party's silence or inaction, mere silence or inaction without fraudulent intent does not constitute fraud." *Terrebonne Concrete, LLC v. CEC Enterprises, LLC*, 11-0072 (La. App. 1

Cir. 8/17/11), 76 So. 3d 502, 509, writ denied, 11-2021 (La. 11/18/11), 75 So. 3d 464 (the trial court's finding of liability against the president of the business was in error and "was obviously based primarily, if not exclusively, upon his status as [] president, 'the person in charge,'". . . "rather than upon any legal duty owed by him personally" . . . "or upon any actual evidence of fraudulent intent on his part." Officers cannot be held personally liable to third persons for negligence, maladministration of business affairs, or omission of duty for acts done on behalf of the business, especially in a commercial context).

A claimant must produce sufficient evidence of fraudulent intent. The requisite intent to defraud or a finding of no fraudulent intent may be inferred from the totality of the circumstances and from statements and conduct. "Fraud may be predicated on promises made with the intention not to perform at the time the promise was made", but it cannot be predicated on unfilled promises or statements as to future events. *Sun Drilling*, 798 So. 2d at 1152.

Our Court in *Sun Drilling* provides the following fraud analysis under La. C.C. art. 1953:

> The investors argue that the trial court erred by awarding Rayborn damages for breach of contract after finding the investors defrauded him. Rayborn argues on appeal that the investors defrauded him, since they never intended to pay him for his 1993 tax liability. However, the trial court specifically found that Rayborn failed to prove fraud in the inducement of the contract. A cause of action for intentional fraudulent misrepresentation as to present or past facts exists in Louisiana. A party who is injured by fraud and deceit of another has a cause of action for damages. Fraud, however, cannot be predicated on unfulfilled promises or statements as to future events. Fraud may be predicated on promises made with the intention not to perform at the time the promise is made. . . .
>
> Two elements are necessary to prove fraud: (1) an intent to defraud and (2) actual or potential loss or damage. Federal courts applying Louisiana law indicate that reliance is an element of a claim for fraud. Moreover, for fraud or deceit to have caused plaintiff's damage, he must at least be able to say that had he known the truth, he

would not have acted as he did to his detriment. Whether this element is labeled reliance, inducement, or causation, it is an element of a plaintiff's case for fraud. The party alleging fraud need only prove these elements by a preponderance of the evidence. Circumstantial evidence, including highly suspicious facts and circumstances surrounding a transaction, may be considered in determining whether fraud has been committed.

The trial court found that Rayborn failed to prove that the investors did not intend to perform at the time of the various agreements. However, the trial court concluded that the investors defrauded Rayborn and thus found them personally liable. We agree with the trial court that the record does not contain sufficient evidence of the investors' intent to defraud Rayborn. Moreover, Rayborn did not answer the appeal and challenge this finding.

The record contains no evidence that Rayborn relied to his detriment on the investors' misrepresentations or omissions in the performance of the contract. We do not disagree with the factual findings of the trial court. The investors, through Astugue, either intentionally or negligently misrepresented Sun's opinions regarding Rayborn's job performance. The investors did not fully disclose to Rayborn the facts of their attempts to sell Sun. However, Rayborn neither alleged nor proved how these misrepresentations or omissions caused him damage. Although the record convinces us that the investors did not disclose important information, including Sun's potential liability to Rayborn for the enormous royalty benefit to prospective buyers, the record contains no evidence that Rayborn relied on these misrepresentations or omissions to his detriment. Rayborn proved that the investors failed to disclose particular information to him and to other individuals. Moreover, he proved damages, but we find no evidence in the record that the investors' omissions or misrepresentations caused his damages or his termination.

798 So. 2d at 1152-53 (citations omitted).

Ed Mathes testified that he was not made aware of Karlton/ISG's abandonment. Ambrosia testified that he assumed that Ed Mathes knew about the abandonment, as Mathes had not submitted an invoice for 2008 services, nor demanded payment on outstanding invoices for 2007 services for a period of almost five years, and other business ventures were being discussed to carry out some version or a revision of the Project to completion. The assurances made by

30

Ambrosio and Lipkins to Ed Mathes that "the money [is] coming, the money [is] coming" must be viewed during the time periods that they were made, especially with respect to the intent of the parties throughout the various stages of the venture in this commercial setting, as our court explained in *Sun Drilling*. Ed Mathes testified that he was not concerned about Karlton's financial wherewithal to complete the Project and that he continued to work on the Project despite lack of payment because the "project was too important as I've tried to explain to the city, to us, to the people of the Westbank and . . . he wanted it to succeed and we kept getting at least verbal assurances that we would be paid." Separate negotiations with the Kerns are far removed in time from the pertinent circumstances[33] and I find insufficient evidence in the record to conclude that the conduct of principals of Karlton/ISG or Members caused the resultant damage to Mathes for nonpayment of the Outstanding Balance and the 2013 Invoice.

Moreover, the release of the Mortgage and the Note was partially due to the fact that the Note prescribed. Mathes failed to produce any evidence to the contrary. The releases were executed after Mathes' petition was filed; thus, fraud, if any exists as to the releases, is not pertinent to this case. Mathes made business decisions not to pursue actions against Karlton/ISG until after the Project stalled for years and the Note prescribed and further made the decision not to pursue a claim against River Street for allegedly unjust displacement of assets at the expense of Mathes for using Mathes' architectural work product. The failure of Mathes to act diminished the options available to Mathes as a judgment creditor and those afforded to an impoverished obligee against an obligor.[34] Mathes failed to prove the necessary causation, which resulted in his damages.

_____

[33] *See supra* note 8.

[34] *See supra* note 17 and accompanying text.

The circumstances in this case are not extraordinary and do not present an exceptional circumstance such that would allow for Members' liability for Karlton/ISG's debts. The facts presented at trial weigh in favor of sustaining the general shield of limited liability of Members and not in the removal of such protection intended by our legislature. The conduct of the parties does not give rise to fraud. The inferences made by the district court from the totality of the circumstances were unreasonable to find that the LLC form was used to defraud a creditor. After a review of the record and applicable law, there is no evidence of fraud by which Members could be held liable notwithstanding that they are members of Karlton/ISG.

As required by *Ogea*, an analysis as to the applicability of the Negligent or Wrongful Act Exception, which includes, *inter alia*, any claim of a wrongful act such as those found in the *Riggins* Exception and as pled by Mathes, should be as follows:

> [T]he exception for a "negligent or wrongful act" does not define those terms and requires an evaluation of where a cause of action may be established "by law." ...Unlike the other exceptions, the "negligent or wrongful act" exception does not suggest a singular statutory definition. Indeed, the "negligent or wrongful act" exception differs from the other exceptions examined because the "negligent or wrongful act" exception contains two distinct concepts (*i.e.,* the exception applies to an act that is "negligent" or an act that is "wrongful").

*Ogea,* 130 So.3d at 899.

To determine the meaning of "negligent or wrongful act," the Court examined many areas of the law, including tort and criminal, before coming to the following conclusions:

> Because these concepts appear with great frequency outside of tort law, we find that the terms "negligent" act and "wrongful act" as employed … are not limited to "torts." We are, however, equally mindful that the terms "negligent" act and "wrongful act" are part of an exception… and that the general rule, and hence the general goal, of the limited liability provision… is to afford limited liability. *Compare* La. R.S. 12:1320(B) and (D); *see also* Deborah A.

Wisnowski, *Comment: The Louisiana Limited Liability Company Law: A Gumbo of Previously Existing Business Entities,* 39 Loy. L. Rev. 185, 191 (Spring 1993) (noting the "LLC's objective is to offer its members liability exposure limited to each member's capital contribution."). Therefore, to accord the terms "negligent" act and "wrongful act" their commonly understood meaning while also respecting the general limitation of liability, we find the following four factors assist our inquiry: 1) whether a member's conduct could be fairly characterized as a traditionally recognized tort [tort factor]; 2) whether a member's conduct could be fairly characterized as a crime, for which a natural person, not a juridical person, could be held culpable [criminal conduct factor]; 3) whether the conduct at issue was required by, or was in furtherance of, a contract between the claimant and the LLC [contract factor]; and 4) whether the conduct at issue was done outside the member's capacity as a member [factor of acting inside or outside the LLC].

*Id.* at 900-01.

The Court further explained that the concepts of "negligent" act and "wrongful act" are also employed synonymously outside tort law as follows:

> For example, these concepts can be found in prominent areas of the law, such as in criminal law. *See* La. R.S. 14:8(3) ("Criminal conduct consists of: ... Criminal negligence that produces criminal consequences."). The concept of being "negligent" is embraced by this statute. Additionally, a "wrongful act" appears to be analogous to "[a]n act ... that produces criminal consequences" where there is either "criminal intent" or "where there is no requirement for criminal intent." *See* La. R.S. 14:8(1) and (2); *see also* La. R.S. 14:10 (defining acts produced by specific and general intent under criminal law).
>
> The concepts of a "negligent or wrongful act" can also be found in more arcane areas of the law, such as the law governing bonds for court reporters and even in mineral law. *See* La. R.S. 13:961(B) ("Any party litigant shall have a right to sue on said bond for any damages sustained by said party litigant by any wrongful act or neglect of duty committed or omitted by the official court reporters in the performance of the duties of official court reporters."); *see also* La. R.S. 31:12 ("the owner of land may protect his rights in minerals against trespass, damage, and other wrongful acts of interference by all means available for the protection of ownership.").

*Id.* at 900.

*The Tort Factor*

"A court is to evaluate each situation on a case-by-case basis and consider each of the above factors when determining whether the general rule of limited liability must yield to the exception for a member's 'negligent or wrongful act.'" *Ogea*, 130 So.3d at 905. Because "negligent" act and "wrongful act" are common features of tort law, the tort factor may be dispositive in determining whether or not piercing of the company veil is required. *Id.* The duty owed and alleged breached under the tort factor must be a duty in the tort sense, not in the contractual sense. *Id.* at 901. "Simply put, the inquiry is whether the plaintiff has any law-statutory, jurisprudential, or arising from general principles of fault-to support his claim." *Id.,* at 905 (quoting *Faucheaux v. Terrebonne Consol. Government,* (La. 2/22/93), 615 So.2d 289, 292).

Mathes established nothing at trial from which I can discern a tort duty owed to it by Karlton/ISG or Members; rather the duty breached was a contractual one.[35] Therefore, I find that the tort factor is unmet.

*The Criminal Factor*

The second factor requires us to determine whether the conduct at issue violates a criminal statute intended to protect the claimant from the type of harm that ensued. *Ogea,* 130 So.3d at 904. In its petition, Mathes did not allege any type of criminal conduct.[36] However, Mathes claims that Karlton/ISG made

---

[35] Compare *Matherne v. Barnum,* 11-0827, p. 10 (La.App. 1 Cir. 3/19/12), 94 So.3d 782, 789-90 (court found defendant subject to personal liability arising from his own negligence in performing the construction, but pretermitted piercing the corporate veil claim); and *Regions Bank v. Ark-La-Tex Water Gardens*, L.L.C., 43,604, p. 12 (La.App. 2 Cir. 11/5/08), 997 So.2d 734, 741 (court found individual member of defendant LLC personally liable due to his own negligence); with *Nunez*, 15-0087, p. 12 180 So.3d at 293-94 (court held (1) defendant did not owe plaintiff separate tort duty and (2) showing of poor workmanship arising out of contract entered into by LLC insufficient to establish "negligent or wrongful act," to find defendant individually liable for negligent or wrongful acts).

[36] The following causes of action were asserted by Mathes in its petition:

1. Breach of Contract;
2. Suit on Open Account;
3. Unjust Enrichment;
4. Declaratory Relief;
5. Contractual Termination Damages; and

certain misrepresentations on its tax returns regarding capitalization and abandonment. I, however, find that such conduct cannot be characterized as a crime under the Criminal Factor.[37]

Any actions taken by Karlton/ISG related to the reporting positions taken on its tax returns is totally irrelevant to this case, as Mathes neither relied on those tax returns nor requested copies of the tax returns prior to filing suit. This evidence is pertinent only as to making reasonable inferences from the conduct of principals acting on behalf of Karlton/ISG and/or Members to show intent to defraud Mathes as a creditor as to its abandonment of Mathes' work, which was earlier addressed under an analysis of the Fraud Exception. As Mathes did not become aware of the tax return classifications claimed by Karlton/ISG until after filing its petition, any "tax evasion", if such exists, was not perpetrated against Mathes. *See Brennan's Inc. v. Colbert*, 11-1095, p. 8 (La.App. 4 Cir. 2/29/12), 85 So.3d 787, 792.[38]

*The Contract Factor*

In the third factor, I examine whether the member's conduct at issue was required by, or was in furtherance of, a contract between Mathes and Karlton/ISG.

---

6. Alter ego liability

[37] Compare *Nicholas v. BBT Const. Mgmt., L.L.C.*, 15-1009 (La.App. 1 Cir. 12/23/15), 2015 WL 9466864 at *4 (*unpub.*) (defendant committed negligent or wrongful act subjecting him to narrow personal liability exception, where actions could be characterized as a tort for refusal to return the unused funds. "This failure to refund the unused funds could be considered a delictual action or tortious conversion," but "failure to return the unused portion of the contract price could be perceived as a crime of theft.") with *Nunez,* 15-0087, pp. 12-13, 180 So.3d at 293 (court found defendant's acts or failure to act did not violate a criminal statute granting right of restitution, noting (1) "if the conduct at issue constitutes a crime, that fact weighs in favor of allowing the victim(s) to recover against the offender;" (2)"only crimes for which a natural person may be held culpable should be considered, although the member need not have been actually convicted of the crime to establish the factor of criminal conduct as a 'negligent or wrongful act;'" and (3) "violation of a criminal statute, whether prosecuted or not, is but one factor to consider in determining whether an exception to the rule of limited liability would lie.")

[38] The difference between tax evasion and tax avoidance largely boils down to two elements: lying and hiding. Tax avoidance is structuring affairs so one pays the least amount of tax due. Tax evasion is lying on an income tax form or any other form. *Thomas v. Bridges*, 13-1855, p. 10 (La. 5/7/14), 144 So.3d 1001, 1008 ("Use of particular business entities to avoid taxes and other liabilities, far from being fraudulent, is a common and legal practice...The legal right of a taxpayer to decrease the amount of what would otherwise be his taxes, or altogether avoid them by means which the law permits, cannot be doubted.") Although tax evasion is illegal, tax avoidance is not.

*Ogea,* 130 So.3d at 906. In this case, a contract existed between Karlton/ISG and Mathes whereby Mathes was to provide architectural services and Karlton/ISG owed payment for those services. The suit centered on payments due and owed to Mathes by Karlton/ISG. The "contract" factor, therefore, weighs against holding Members solidarily liable for the debts of Karlton/ISG.

*The Capacity Factor*

Finally, "[t]he fourth factor requires us to examine whether the conduct at issue was done outside the member's capacity as a member of an LLC." *Id.* I find evidence suggesting that principals, on behalf of ISG Co., acted outside Karlton/ISG's LLC structure when they created River Street and pursued other business ventures with the Kern Entities. However, these business activities occurred many years after the Agreement, after Karlton Corp. ceased making capital contributions to Karlton/ISG, the joint venture was abandoned, the Note presumably prescribed leaving it with little or no value, and the Project failed to be carried out to completion while at the same time Mathes did not avail itself of legal recourse against Karlton/ISG or River Street. Moreover, at trial, Ed Mathes testified that he was fully aware that Mathes was contracting with Karlton/ISG and that the contract was neither with Karlton Corp. nor ISG Co. Further, as the contract was between Mathes and Karlton/ISG, no issue of an undisclosed mandatary relationship existed for which Members could be held liable. During pertinent times and early in the business venture, Members acted "inside" rather than "outside" the structure of Karlton/ISG. The passage of a substantial amount of time and the peculiar circumstances of the Project, the business arrangements, and the capacities of the parties, weigh in favor of sustaining the general shield of limited liability of Members as to the Capacity Factor.

In applying the four *Ogea* factors to the totality of the circumstances of this case, I find that the Negligent or Wrongful Act Exception does not apply. After a

36

review of the record and applicable law, there is no evidence of a wrongful act by which Members could be held liable notwithstanding that they are members of Karlton/ISG.

The application of both the Fraud Exception and Negligent or Wrongful Act Exception and the *Ogea* Methodology taking into account *Riggins* principles of fault reveals the fact-driven nature of classifying transfers of a business asset to another legal entity so that it may be held or used as a fraudulent or wrongful act that would allow for the removal of the general shield of protection and limited liability of LLC members. Even assuming that the cancelation of the Note and release of the Mortgage amounted to a transfer of an asset with value and caused or increased Karlton/ISG's insolvency which caused nonpayment to Mathes (none of which were proved at trial with sufficient evidence or properly before us),[39] such conduct under certain business circumstances will be allowed from a commercial perspective as *Ogea* does not attempt to establish a bright-line rule in analyzing business activities and differentiating between assets. Such a rule would prove unworkable given the fact-driven nature of business dealings in the commercial context. Louisiana Revised Statute 12:1320 and the *Ogea* Methodology provide a workable legal analysis and greater guidance than *Riggins* only. *Ogea* provides clarity to current and prospective business owners and limited liability entities that desire to engage in business in our state.

The holding of the district court invoking only a judicially created exception and allocation of fault award[40] exceeds the authority that has been bestowed by the

---

[39] *See Forterra Capital, L.L.C. v. Mamal, Inc.,* 10-0798 (La.App. 4 Cir. 1/13/11), 55 So.3d 963 (transfer of machines used to clean tanks on offshore supply vessels and all present and future rights thereto by judgment debtor did not increase his insolvency, for purposes of action by judgment creditor to annul transfer on the basis that judgment creditor attempts to collect a debt owed to it, where judgment debtor's balance sheet indicated insolvency was greater the day before the transfer than the day after and the insolvency antedated the transfer complained of).

[40] The district court found solidary liability without a review of the applicable statutory laws regarding allocation of fault. *See e.g.* La. C.C. art. 2324(A)("He who conspires with another person to commit an intentional or willful act is answerable, in solido, with that person, for the

Legislature and the citizenry of this State, especially given its failure to follow

*Ogea* and legislatively created causes of action and allocation of fault laws. These

statutes were carefully crafted to balance the requirement for businesses to operate

with honesty in both form and substance while promoting "business in the state by

limiting personal liability for some debts incurred or acts performed on behalf of

business entities . . . *albeit* with certain exceptions." Nunez, 180 So.3d at 289. To

undo this balance from the bench is to reach beyond the authority of a judge. As

explained in *Hoag v. State*, 04-0857, p. 4 (La. 12/1/04), 889 So.2d 1019, 1022:

> Our state constitution divides governmental power
> into separate legislative, executive and judicial branches
> and provides that no one branch shall exercise powers
> belonging to the others. La. Const., art. II, §§ 1, 2. This
> trichotomous branching of authority furnishes the basis
> for the existence of an inherent judicial power which the
> legislative and executive branches cannot abridge.
> *Singer, Hutner, Levine, etc. v. LSBA,* 378 So.2d 423 (La.
> 1979); *Saucier v. Hayes Dairy Products,* 373 So.2d 102,
> 109, 114 n. 3 (La. 1979). Likewise, the judicial branch
> is prohibited from infringing upon the inherent powers
> of the legislative and executive branches. *LaBauve v.
> Louisiana Wildlife and Fisheries Comm'n,* 289 So.2d
> 150, 151 (1974).

The district court disregarded the statutory scheme that businesses rely on and

resulted in its failure to provide a clear legal analysis that would promote uniform

---

damage caused by such act"). The district court failed to provide proper analysis as to whether liability arises from criminal, intentional, willful, wrongful, fraudulent, or tortious actions in its assessment of damages. The finding of solidary liability does not seem to stem from statutory law but from *Riggins*, which allows for corporate shareholders to be personal liable for debts of the corporation. Thus, solidary liability as vaguely applied in this context can also be viewed as judicially-created. Moreover, it does not fit well into the statutory scheme of comparative fault and joint and divisible obligations (La. C.C. art. 2323 and 2324 (B)), several, joint, and solidary obligations (La. C.C. arts. 1786, et seq), and solidary liability for intentional and willful acts (La. C.C. art. 2324(A)). While one may question the advisability of this statutory scheme, we are bound to follow it. *See Soloco v. Dupree,* 97–1256 (La. 1/21/98), 707 So.2d 12, 17 ("It is not the prerogative of the judiciary to disregard public policy decisions underlying legislation or to reweigh balances of interests and policy considerations already struck by the legislature"). The district court's disregard for the statutory scheme for the allocation of fault results in an unfair, vague, and baseless decision, especially finding Karlton Corp. solidarily liable. There is insufficient evidence to find that principals of Kartlon Corp. conspired with principals of ISG Co. and Karlton/ISG to defraud Mathes. The district court found that principals of ISG Co. began efforts to develop the Project separately and at the time of the trial "it was established that some of those efforts continue to this day."

results, development of the *Ogea* Methodology, and provide clear direction to current and prospective business owners and limited liability entities.

In conclusion, the conduct of the parties and the peculiar circumstances of the case *sub judice* do not give rise to fraudulent or wrongful acts or solidary obligations as contemplated by the legislature in enacting La. R.S. 12:1320(D) and La. C.C. art. 2324(A) or pursuant to the Louisiana Supreme Court's legal analysis in *Ogea* that would allow for Members to be responsible for the debts of Karlton/ISG. The inferences made by the district court from the totality of the circumstances were unreasonable and it erred in its application of the law finding Members solidarily liable with Karlton/ISG based on either a manifest error[41] or *de novo* review. Therefore, assignment of error one has merit and I would reverse those portions of the judgments holding Members solidarily liable with Karlton/ISG.

Based on the foregoing, I would affirm the September 26, 2018 judgment that awards damages in favor of Mathes and against Karlton/ISG in the amount of $944,669.23 plus interest. I would also affirm the January 11, 2019 judgment that taxes costs in the amount of $61,366.34 against Karlton/ISG. I would reverse those portions of the September 26, 2018 and January 11, 2019 judgments holding ISG Co. and Karlton Corp. solidarily liable with Karlton/ISG.

---

[41] *See supra* note 28.